**APPLEGATE, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 92–832 L.

United States Court of Federal Claims.

June 27, 2002.

Roy B. Dalton, Jr., Orlando, Florida, for plaintiffs, with whom was George W. Miller, Washington, D.C.

Scott H. Park, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., for defendant, with whom was Assistant Attorney General Thomas L. Sansonetti, Environment and Natural Resources Division, U.S. Department of Justice.

## ORDER ON ATTORNEYS FEES

ALLEGRA, Judge.

*Blind Plaintiff, lame Defendant,*
*share the Friendly Laws impartial care,*
*A Shell for him, A shell for thee,*
*The Middle is the Lawyer's Fee.*[1]

Before the court are the remnants of a hotly-contested taking action stemming from the erosion of Cocoa Beach and other beach holdings south of Cape Canaveral, Florida, allegedly caused by the construction, maintenance and operation of the Port Canaveral jetties. The substantive merits of this case have been resolved via a settlement agreement. That same agreement provides the backdrop for the matter at hand—plaintiffs' entitlement thereunder to a "reasonable" attorneys fee. Perhaps not surprisingly, given the high stakes, the parties' views of what is "reasonable" diverge dramatically and, following extensive briefings and an evidentiary hearing, it falls upon this court to decide how much plaintiffs are owed. For the reasons that follow, the court concludes that plaintiffs

shall be awarded attorneys fees in the sum of $1,803,575.

### I. Background

To put matters in perspective, a little background is in order.

On December 4, 1992, numerous plaintiffs filed suit in this court seeking compensation for alleged losses due to beach erosion on their properties in Brevard County, Florida, caused allegedly by defendant's construction, operation and maintenance of Canaveral Harbor and, in particular, its jetties. Plaintiffs retained the firm of Gray, Harris, Robinson, Kerschenbaum & Peeples (Gray Harris). Under the retainer agreement, each plaintiff agreed, as follows:

> The court will first determine whether a 'taking' has occurred. You are obligated to us for fees and costs **ONLY** if a 'taking' is found to have occurred **AND** a recovery is made. In such circumstances, our fee will be one-third (1/3) of the value of the benefits obtained (40% if an appeal is involved) or the court award of fees, whichever is greater, but not both. In addition, your proportional fair share of the costs will be paid out of your recovery.

The retainer agreement further provided that "[i]f the court finds no taking has occurred we have the right to dismiss and discontinue working the case and you will owe us nothing."

On June 14, 1993, this court (Judge Miller) dismissed plaintiffs' complaint on the ground that it was barred by the applicable statute of limitations. *Applegate v. United States,* 28 Fed.Cl. 554 (1993). On appeal, the Federal Circuit determined that the complaint was not barred because the landowners' claim did not accrue more than six years before its filing. The court of appeals reversed and remanded for further proceedings. *Applegate v. United States,* 25 F.3d 1579 (Fed.Cir. 1994). After various forms of procedural wrangling, including one particularly contentious discovery matter,[2] as well as the denial

---

1. Benjamin Franklin, *Poor Richard's Almanack* (1733), in *Papers of Benjamin Franklin* 1:318 (Leonard W. Laaree ed., 1959).

2. During discovery, a lengthy dispute arose concerning the adequacy of plaintiffs' response to

Interrogatory 8 posed by defendant. Ultimately, Judge Miller ordered sanctions against the plaintiffs, ruling that they were ineligible to receive any attorneys and consultants fees in connection with Interrogatory 8. *See Applegate v. United States,* 35 Fed.Cl. 47, 58–59 (1996); *see also*

of a motion for summary judgment, the settlement of this action began to take form following the passage of the Water Resources Development Act of 1996, Pub.L. No. 104–303, section 101(b)(7) of which authorized a shore protection project for Brevard County. The Project was to be developed in accordance with certain plans, and subject to certain conditions, recommended in a report authored by the United States Army Corps of Engineers and submitted to the Secretary of the Army on December 23, 1996.

That report defined what came to be known as the "Brevard County Shore Protection Project" (the Project), which it described as including beach fill placement along two shoreline reaches. The most northern of these reaches, bounded by the south jetty of Canaveral Harbor to the north and Patrick Air Force Base to the south, involved properties that are the subject of this lawsuit. This area was to receive beach fill along 9.4 miles of shoreline, requiring approximately 2.5 million cubic yards of beach fill. According to the report, the estimated total construction cost for the north reach plan would be approximately $18,126,000, including $17,892,000 for initial construction and $234,000 for project monitoring. In addition, the report anticipated that additional renourishment would be provided at 6–year intervals over the 50–year life of the Project, with an associated cost of each future nourishment of $4,895,000.

Spurred by the passage of the Water Resources Development Act, and subsequent actions taken by the Corps in furtherance of the Project, the parties, on October 29, 1999, entered into a Settlement Agreement (the Agreement) and Stipulation to Entry of Final Judgment in the above-referenced matter. Pursuant to the Agreement, defendant agreed to pay plaintiffs $5 million, plus interest from October 29, 1999, and to construct the Project, as defined in the Agreement, upon the appropriation of the necessary funds by the Congress. In addition, paragraph II.1.B of the settlement agreement provided:

> For purposes of this Settlement Agreement, Plaintiffs are entitled to recover reasonable attorneys' fees and costs. An award to Plaintiffs for Plaintiffs' attorney fees and costs ... incurred in connection with the Lawsuit as of the date of this Agreement shall be made in an amount to be agreed to by the parties within (30) days subsequent to the date of the appropriation described in paragraph II.1.A. above, or failing agreement, as determined to be reasonable by the United States Court of Federal Claims Judge Lawrence S. Margolis following the submission of documentation of said costs and fees, subject to review by appeal upon petition by either party as provided by law.

Plaintiffs further agreed to endeavor, for three years subsequent to the date of the Agreement, to obtain Congressional appropriations for the Project. Under the Agreement, the full terms of the settlement would become operative only once appropriation bills were passed that committed not less than 40 percent of the Federal funds estimated to be needed for the initial construction of the Project.[3] Once the Agreement took effect, the Corps agreed to construct the Project within a defined period of time.

In 1999, $5 million was appropriated for the Project. Then, on October 27, 2000, President Clinton signed into law H.R. 4635, which contained an appropriation for an additional $6 million for the Project, bringing the total appropriations to $11 million and thereby triggering the conditions for the Agreement to take effect, including the recovery of attorneys fees. *See* Pub.L. No. 106–377, 114 Stat. 1441 (2000). The actual cost for Phase I of the Project is $23.1 million, of which the Federal share is $14.3 million. Phase I of Project was completed in early 2002. The cost of Phase II of the Project is projected to be $18 million, of which the Federal share is projected to be $11.2 million. The total cost of the Project is now expected to be approxi-

---

Transcript of Aug. 9, 1996 ("Plaintiffs are on notice that no cost whatsoever associated with complying with Interrogatory 8 will ever be borne by the Government, none whatsoever.").

**3.** The Agreement estimated that a total of $21,479,000 would be needed for this purpose, 40 percent of which was $8,591,600.

mately $42 million, of which the Federal share is projected to be $25.5 million.

As noted above, under the Agreement, Senior Judge Margolis was assigned the responsibility of ascertaining a "reasonable" fee should the parties be unable to agree as to an amount. After no such agreement materialized, on November 13, 2000, Gray Harris filed a motion for fees and costs, seeking $1,990,189.00 in attorneys fees and $190,752.13 in costs, as well as expert fees in the amount of $1,020,405.21. Subsequently, on January 19, 2001, plaintiffs filed an amended motion for fees and costs, which sought a considerably greater amount than their first motion. Following a hearing on this amended motion, on April 12, 2001, plaintiffs filed a motion for evidentiary hearing or, in the alternative, for the court to accept evidence in support of plaintiffs' amended motion for attorneys fees and costs. On August 3, 2001, Senior Judge Margolis granted plaintiffs' motion for an evidentiary hearing. However, because he had participated in significant settlement discussions with the parties, Senior Judge Margolis recused himself from further proceedings in this case. This case was subsequently assigned to the undersigned judge, who, on January 29–30, 2002, conducted the aforementioned evidentiary hearing. At that hearing, the court received evidence on, *inter alia*, the accuracy of Gray Harris's billing records and the benefits received by plaintiffs and other property owners as a result of the beach renourishment. Following the filing of post-evidentiary hearing briefs, closing arguments on this matter were heard on March 8, 2002.

## II. Discussion

Determining what fees are owed in this case hinges, at least in the first instance, on identifying the proper standard for evaluating what is "reasonable" within the meaning of the Agreement. That topic, therefore, warrants more than a little initial scrutiny.

### A. The Legal Standard for Determining What is Reasonable

We begin with first principles. Traditionally, under the so-called "American Rule," litigants generally pay their own way. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). For more than century, however, courts have awarded fees to an attorney who succeeds in creating, protecting or enhancing a common fund from which members of a class are compensated for a common injury inflicted on the class. *See, e.g., Sprague v. Ticonic National Bank*, 307 U.S. 161, 164–67, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); *Trustees v. Greenough*, 105 U.S. 527, 537, 26 L.Ed. 1157 (1881). Under this "common fund" doctrine, typically applied in class actions, the attorneys whose efforts benefitted the fund are entitled to a reasonable fee to be paid from the fund as a whole. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) (citing cases). The underlying rationale for this doctrine, as explained in several early Supreme Court cases, is the equitable notion that the payment of "fair and just allowances for expenses and counsel fees" should be spread among all the beneficiaries of the fund lest some of those individuals be unjustly enriched by the attorney's efforts. *See Central R.R. & Banking Co. of Georgia v. Pettus*, 113 U.S. 116, 126–27, 5 S.Ct. 387, 28 L.Ed. 915 (1885); *Greenough*, 105 U.S. at 532; *see also Boeing*, 444 U.S. at 478, 100 S.Ct. 745; *Third Circuit Task Force, Court Awarded Attorney Fees*, 108 F.R.D. 237, 241 (1986).

The other major exception to the American Rule involves not fee-spreading, but rather fee-shifting, and arises generally under statutes enacted by Congress. The Uniform Relocation Assistance and Real Property Acquisition Policy Act (URA), 42 U.S.C. § 4654(c), constitutes such a proviso. It states that a court rendering a judgment awarding compensation for the taking of property by a Federal agency, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff "such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney ... fees, actually incurred because of such proceeding." While the URA

is among a handful of Federal statutes that require awardable fees to have been "actually incurred," *see also, e.g.,* 45 U.S.C. § 726(f)(9) (Regional Rail Reorganization Act), numerous federal fee provisions and rules allow for the recovery of "reasonable" attorney fees that were simply "incurred."[4] And still other fee-shifting statutes authorize the award of "reasonable" attorneys fees without any mention as to what was "incurred" or "actually incurred."[5] *See West Virginia Univ. Hospitals, Inc. v. Casey,* 499 U.S. 83, 89 n. 4, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) (cataloguing numerous federal fee-shifting statutes).

As will be seen, cases construing these fee-shifting provisions, as well as those involving the "common fund" doctrine, represent *terra fertilis* from which to harvest the principles for determining what is a "reasonable" fee here. Defendant, however, would take matters further. It argues that the calculation of the fee here is controlled exclusively by the URA, and that only the methods that courts have specifically sanctioned under that statute—those which calculate the fees "actually incurred"—may be employed here. For the following reasons, this court disagrees.

### 1. The URA is not directly controlling here

Defendant's assertions regarding the URA are misplaced for several reasons:

First, as a matter of simple contract interpretation, there is no indication that the Agreement incorporated the attorney fee provisions in the URA. An agreement to settle a legal dispute is a contract, the interpretation of which is governed by familiar principles. *See, e.g., United States v. ITT*

*Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975). The language of the Agreement thus must be given the meaning that would be derived from the contract by a "reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 351 F.2d 972, 975 (1965). Here, the Agreement makes no mention of the URA, even though it incorporates by reference several other Federal statutes, for example, citing the Declaration of Taking Act to control certain interest calculations. Nor do any of its provisions, some of which provide significant details regarding the process for calculating the fee, even track the language of the URA—unlike that statute, for example, the Agreement does not indicate that the "reasonable" attorneys fees owed had to be "actually incurred." Thus, there is nothing within the four corners of the Agreement that supports defendant's position.

Indeed, while parole evidence is of dubious value on this issue, owing to the lack of any ambiguity in the Agreement, it remains that there is not a shred of evidence that suggests either that the parties intended that the determination of a "reasonable" attorneys fee would be controlled by the URA, or even that defendant somehow unilaterally expressed or reserved this point. The court is left then with the possibility that defendant had an unexpressed intention to invoke the URA, but as stated by the Federal Circuit, the " 'subjective unexpressed intent of one of the parties' to a contract is irrelevant." *Andersen Consulting v. United States,* 959 F.2d 929, 934 (Fed.Cir.1992) (quoting *ITT Arctic Servs., Inc. v. United States,* 207 Ct.Cl. 743, 524 F.2d 680, 684 (1975)).[6] Thus, as a plain

---

4. *See, e.g.,* 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 5 U.S.C. § 552a(g)(2)(B) (Privacy Act of 1974); 28 U.S.C. § 593(f)(1) (Independent Counsel Act); 42 U.S.C.A. § 300aa–15(e) (National Vaccine Compensation Act Program); Fed.R.Civ.P. 37(a)(4)(A) (discovery sanctions). *See also Raney v. Federal Bureau of Prisons,* 222 F.3d 927, 934 (Fed.Cir.2000) (en banc).

5. *See, e.g.,* 42 U.S.C. § 1988(b) (Civil Rights Act Attorney's Fees Awards Act of 1976); 29 U.S.C. § 1132(g) (Employee Retirement Income Security Act of 1974).

6. *See also Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 444 F.2d 547, 551 (1971), *later proceeding, Firestone Tire & Rubber Co. v. United States,* 196 Ct.Cl. 807 (1971); *PCL Const. Services, Inc. v. United States,* 47 Fed.Cl. 745, 785 (2000). Defendant also seems to suggest that because it subjectively believed that the URA was controlling, while plaintiffs did not, there was no meeting of the minds as to this portion of the Agreement. This sort of contention is far too convenient, for it effectively would allow one contracting party to renege on a contract at will based on unexpressed intentions. Such is decidedly not the law, particularly where, as here, there is no ambiguity in the contract itself. *See*

vanilla matter of contract interpretation, this court sees utterly no basis upon which to graft upon the Agreement the supposedly limiting language of the URA.

Second, the URA does not control here as a matter of law. Seeking a backdoor means of enforcing its interpretation of the Agreement, defendant quixotically asserts that the award of attorneys fees must be limited by the URA, because, absent that statute, the Attorney General's representative would have lacked the authority to agree to pay a "reasonable" attorneys fee—their agreement, defendant contends, would both have been *ultra vires* and violated the doctrine of sovereign immunity. *Per contra.* The Attorney General's authority to agree to pay attorneys derives from sections 516 and 519 of Title 28, which provide, respectively, that the conduct of litigation in which the United States is a party is "reserved to officers of the Department of Justice, under the direction of the Attorney General" and that the Attorney General shall supervise all such litigation. 28 U.S.C. §§ 516, 519 (2002).

This conclusion finds solid support in a 1982 opinion of the Justice Department's Office of Legal Counsel. This opinion was authored by then Assistant Attorney General (now Solicitor General) Theodore B. Olson, who limned the law on the Attorney General's settlement powers thusly:

> Executive Order 6166, together with Section 516 and 519 of Title 28 of the U.S.Code (and their predecessor provisions), have been interpreted consistently by the courts to vest the Attorney General

with virtually absolute discretion to determine whether to compromise or abandon claims made in litigation on behalf of the United States. *See New York v. New Jersey,* 256 U.S. 296, 308, 41 S.Ct. 492, 65 L.Ed. 937 (1921); ... In deciding to settle or abandon a claim, or not to prosecute at all, the Attorney General is not restricted to considerations only of litigative probabilities, but rather may make a decision, in his discretion on the basis of national policies espoused by the Executive.... The only limitations placed on the Attorney General's settlement authority are those · which pertain to his litigating authority generally—i.e., explicit statements by Congress circumscribing his settlement authority, ... and the duty imposed on the President by Article II, § 3 of the Constitution to "take Care that the Laws be faithfully executed ...."

OLC, "The Attorney General's Role as Chief Litigator for the United States," 6 U.S. Op. OLC 47, 59–60 (1982).[7] A veritable legion of decisions, both pre— and post-dating the opinion, confirm that the Attorney General may agree to settlement terms inconsistent with, or at least different from, what would have resulted had a case been fully litigated. For example, in words condign here, the Supreme Court long ago stated, in rejecting an attack on the Government's authority to settle an antitrust case on terms allegedly inconsistent with the Sherman Act, that "we do not find in the statutes defining the powers and duties of the Attorney General any such limitation on the exercise of his discre-

---

*also Restatement (Second) of Contracts* § 2 cmt. b (1981).

**7.** As further indication of the Attorney General's authority, this OLC opinion also referred to Executive Order No. 6166, June 10, 1933, reprinted in 5 U.S.C. § 901. Section 5 of this order provides in part:

> As to any case referred to the Department of Justice for prosecution or defense in the courts, the function of decision whether and in what manner to prosecute, or to defend, or to compromise, or to appeal, or to abandon prosecution or defense, now exercised by any agency or officer, is transferred to the Department of Justice.

*See Sagebrush Rebellion, Inc. v. Watt,* 713 F.2d 525, 529 (9th Cir.1983); *United States v. Newport News Shipbuilding & Dry Dock Co.,* 571 F.2d

1283, 1287 (4th Cir.1978), *cert. denied,* 439 U.S. 875, 99 S.Ct. 212, 58 L.Ed.2d 189 (1978). The opinion also drew upon, *inter alia,* two prior opinions in which the Justice Department had concluded that the Attorney General has the plenary power to settle or compromise any case on such terms as he sees fit, except where a given settlement would result in action plainly in conflict with Congressional intent. *See* OLC, "Settlement Authority of the United States in Oil Shale Cases," 4B U.S. Op. OLC 756, 757–58 (1980) (stating settlement authority is plenary except to the extent "where the settlement would result in action plainly at variance with Congress' intent"); 38 Op. Att'y Gen. 98, 99 (1934). *See Burton v. Administrator, General Services Administration,* 1992 WL 300970 (D.D.C.1992).

tion as this contention involves. His authority to make determinations includes the power to make erroneous decisions as well as correct ones." *Swift & Co. v. United States,* 276 U.S. 311, 331–32, 48 S.Ct. 311, 72 L.Ed. 587 (1928); *see also New York v. New Jersey,* 256 U.S. at 308, 41 S.Ct. 492; *Confiscation Cases,* 74 U.S. (7 Wall.) 454, 458–59, 19 L.Ed. 196 (1868).[8]

The only exception to the Attorney General's otherwise plenary settlement authority arises where there is some "clear and unambiguous directive from Congress" that limits that authority. *See Hercules,* 961 F.2d at 798; *see also Executive Business Media, Inc. v. U.S. Dept. of Defense,* 3 F.3d 759, 762 (4th Cir.1993). However, neither the URA nor any other statute constitutes such a "clear and unambiguous" limitation. Certainly, section 4654(c) does not. It obliges the Attorney General to pay fees in certain circumstances, but does not preclude him from agreeing to pay fees in other circumstances or in amounts theoretically in excess of those authorized by the URA. In settlements, then, the URA's fee-shifting provision comprises not a ceiling, but rather a floor, and in no way cabins the Attorney General's normal settlement authority under sections 516 and 519, as well as Executive Order 6166.[9] As such, in the absence of some contractual indication that the Attorney General's designate was acting under or invoking the URA—of which, there is none—this court readily concludes that the Agreement simply requires it to determine a "reasonable" fee independent of any alleged limitations associated with the URA.

Nor does this conclusion clash with the doctrine of sovereign immunity. Sailing headlong into the teeth of the authorities described above, defendant argues that, apart from the URA, there is no waiver of sovereign immunity here to allow for the payment of attorneys fees. In support of this claim, it relies upon *Presidential Gardens Associates v. United States,* 175 F.3d 132 (2d Cir.1999), in which the Second Circuit held that a settlement agreement could not waive the immunity of the United States from suit. The court reasoned that "[t]he sovereign immunity of the United States may only be waived by federal statute," and quoted from the Supreme Court's seminal decision in *Mitchell,* to the effect that "no contracting officer or other official is empowered to consent to suit against the United States." 175 F.3d at 140 (quoting *United States v. Mitchell,* 463 U.S. 206, 215–16, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)). The government, however, stretches *Presidential Gardens* well beyond its facts and holding. The Second Circuit did not consider whether the Attorney General could agree to pay attorneys fees or other amounts not specifically authorized by a statute, but merely held that a settlement agreement could not independently confer jurisdiction on the district court to enforce such a settlement. Notably, that court observed that the settlement agreement likely could be enforced in this court under the Tucker Act. *Id.* at 141.

---

**8.** For more recent cases on this point, *see United States v. Hercules, Inc.,* 961 F.2d 796, 798–99 (8th Cir.1992) (citing additional cases and noting that the Attorney General's plenary authority "includes the power to enter into consent decrees and settlements"); *Newport News* at 1287 (describing the Department of Justice's authority to settle cases); *Hoskins Lumber Co., Inc. v. United States,* 24 Cl.Ct. 259, 265 (1991).

**9.** A contrary view—that the Attorney General could agree to pay attorneys fees only where a statute specifically authorized him to do so—would have serious ramifications for both the Attorney General and, derivatively, the civil justice system. Such a ruling would prevent the Attorney General from settling most cases in which the payment of attorneys fees is a deciding factor. Unlike the URA, most fee-shifting stat-

utes, prominently among them the Equal Access to Justice Act and the Civil Rights Attorney's Fees Awards Act, provide no authorization for the Attorney General to agree to pay attorneys fees. Thus, under defendant's view of the law, the Attorney General would be unable to agree to pay attorneys fees in settlements of cases covered by those statutes. Such a construction of the law, if adopted, would essentially force plaintiffs to litigate matters to completion in order to recover fees, creating unnecessary litigation, and thereby running contrary to the public policy in favor of settling and quieting litigation. *See Ahern v. Central Pacific Freight Lines,* 846 F.2d 47, 48 (9th Cir.1988); *United States v. McInnes,* 556 F.2d 436, 441 (9th Cir.1977). Fortunately, defendant's cramped view of the law is manifestly erroneous.

In relying on this decision, defendant seemingly addles the concept of sovereign immunity—that the "United States cannot be sued at all without the consent of Congress," *Block v. North Dakota ex rel. Bd. of Univ. and School Lands,* 461 U.S. 273, 287, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983)—with that of settlement authority—that a duly-authorized individual must commit the government to the expenditure of funds. Here, the requisite waiver of sovereign immunity derives not from the Attorney General's statutory authority to compromise this case, but rather from this court's undoubted authority to enforce the Agreement under the Tucker Act. *See McDonald's Corp. v. United States,* 926 F.2d 1126, 1129 (Fed.Cir.1991); *Village of Kaktovik v. Watt,* 689 F.2d 222, 231 n. 76 (D.C.Cir.1982). Moreover, even were some explicit waiver required to oblige the government to pay attorneys fees, the case law suggests that where authority to settle a claim lies, a contract, at least in this court, can effectuate such a "waiver." The Supreme Court signaled as much in *Shaw,* when it stated that immunity for interest may be waived by "statute or *by contract.*" *Library of Congress v. Shaw,* 478 U.S. 310, 317, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) (emphasis added). If "immunity" for interest may be waived by contract, the same must hold true for attorneys fees. Such, indeed, is effectively the holding in several decisions concluding that the government may not invoke sovereign immunity in seeking to avoid the terms of a duly-authorized settlement agreement.[10]

Finally, even if defendant were correct that the URA controls here, there is no indication that the application of that statute would constitute any real limitation on the fee recoverable here. Thus, while defendant's attaches talismanic significance to the statutory requirement that fees be "actually

incurred," the courts have not accorded that language much precision. In most factual settings, they have applied similar methodologies in setting fees whether a particular statute or agreement allowed for the award of "reasonable attorney fees," "reasonable attorney fees incurred" or, as in the URA, "reasonable attorney fees actually incurred." *See, e.g., Raney,* 222 F.3d at 932–34; *Osprey Pacific Corp. v. United States,* 42 Fed.Cl. 740, 742–43 (1999); *Shelden v. United States,* 41 Fed.Cl. 347, 349–351 (1998).[11] By way of further example, this court, in a well-reasoned opinion by Judge Miller, recently rejected the notion that the use of the word "actually" distinguishes the URA from other fee-shifting statutes that employ only the word "incurred," observing:

> The addition of the word "actually," defined by the Oxford English Dictionary as "[i]n act or fact; as opposed to possibly, potentially, theoretically, ideally," appears to do little to qualify this meaning.... Colloquially, at least, one is either liable or one is not—no difference distinguishes one who has become liable. Conversely, an obligation that is not "actually incurred" simple is not "incurred."

*Preseault v. United States,* 52 Fed.Cl. 667, 674–75 (Ct.Cl.2002) (citations omitted); *see also SEC v. Comserv Corp.,* 908 F.2d 1407, 1414 n. 9 (8th Cir.1990) (finding no apparent difference between phrase "actually incurred" in the URA and the word "incurred" in the EAJA). To cinch matters, even if the law were otherwise, defendant wholly fails to explain how, in a case in which plaintiffs' agreement to a 40–percent contingency fee essentially represents the maximum amount of attorneys fees "actually incurred," the application of the supposed limitations in the URA has any real bite.

---

10. *See, e.g., United States v. Bankers Ins. Co.,* 245 F.3d 315, 320 (4th Cir.2001) (holding sovereign immunity waived in agreement submitting matter to arbitration, stating "[p]ut simply, the doctrine of sovereign immunity is not in any way implicated or threatened by the Government's compliance with its contract obligations."); *United States v. McInnes,* 556 F.2d 436, 441 (9th Cir.1977) (sovereign immunity waived in settlement agreement).

11. This overlap is understandable, as the Supreme Court has frequently indicated that its rulings regarding one fee-shifting statute are generally applicable to others. *See, e.g., City of Burlington v. Dague,* 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992); *Hensley,* 461 U.S. at 430 n. 4, 103 S.Ct. 1933.

So, if the URA is not directly controlling here, what is? To that important matter, the court now turns.

### 2. Mapping the Contours of the Reasonableness Inquiry: The Common Fund/Statutory Fee–Shifting Distinction

In arguing what is "reasonable" here, plaintiffs contend their attorneys are entitled to a multiple of the "lodestar" calculation or, alternatively, to some percentage of the entire benefit they received (including the governmental appropriations for the renourishment of their beaches). Defendant, for its part, however, asserverates not only that plaintiffs should be limited strictly to the lodestar calculation, but also that the hours listed by Gray Harris should be reduced for unreasonable, excessive and inadequately-documented billings. These very different approaches yield widely disparate results—while plaintiffs seek as much as $12.3 million, defendant contends that only approximately $1.8 million (or less) is owed.

To resolve this debate, this court initially must decide whether—and to what extent—this case is more appropriately analogized to a statutory fee case, as opposed to a common fund case.[12] This distinction is important because different considerations and factors inform the fee determination in these two kinds of cases. Thus, in fee-shifting cases, the courts have employed a relatively strict version of the lodestar calculation, with most courts following the Supreme Court's generalship in severely restricting the circumstances warranting the application of some multiple to the lodestar. Quite different principles, however, have been applied in common fund cases, in which courts readily calculate fees either as a percentage of the fund recovered or, depending on the circuit, a multiple of the lodestar. *See, e.g., Goldber-*

*ger v. Integrated Resources, Inc.,* 209 F.3d 43, 47 (2d Cir.2000).

### a. Distinguishing Between Fee–Shifting and Fee–Spreading

Which is more applicable here—the fee shifting principles or the fee-spreading rules applicable to common funds? In many cases, of course, this is an easy choice effectively made when a prevailing plaintiff petitions for fees under a given fee-shifting statute, thereby invoking the principles associated with that statute. In other cases, however, courts have grappled with the precise question presented here in deciding how to calculate attorneys fees in the case of a settlement, particularly settlements in matters that, if fully litigated, would have raised the specter of a fee award under a fee-shifting statute. *See* Martha Pacold, "Attorney's Fees in Class Actions Governed by Fee–Shifting Statutes," 68 U.Chi. L.Rev. 1007, 1026 (2001). A review of these cases suggests three key and somewhat interrelated factors have been relied upon in deciding whether an award should be governed by fee-shifting or fee-spreading principles.

The first, quite simply, is whether a common fund exists—whether plaintiff has created, discovered, increased or preserved a fund to which others also have a claim. *See Alyeska Pipeline Service Co.,* 421 U.S. at 257–58, 95 S.Ct. 1612; *see also Chambers v. NASCO, Inc.,* 501 U.S. 32, 45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (noting that the common fund exception "allows a court to award attorney's fees to a party whose litigation efforts directly benefit others"). If no such fund exists, the common fund approach lacks its anchor and is foreclosed. *See Swedish Hospital Corp. v. Shalala,* 1 F.3d 1261, 1268 (D.C.Cir.1993); *Edelman v. PSI Associates II, Inc.,* 147 F.R.D. 217, 220 (C.D.Cal.1993).[13]

---

**12.** Almost 80 years ago, Dean Roscoe Pound wrote in his book *The Interpretations of Legal History* that "all interpretations go on analogies. We seek to understand one thing by comparing it with another. We construct a theory of process by comparing it with another." Roscoe Pound, *Interpretations of Legal History* 151 (1923).

**13.** Early Supreme Court cases seemingly required that the fund be "brought under the direct

control of the court." *See, e.g., Pettus,* 113 U.S. at 124, 5 S.Ct. 387. In recent years, the Court has loosened this requirement, indicating that the court must have "[j]urisdiction over the fund involved in the litigation." *Boeing,* 444 U.S. at 478, 100 S.Ct. 745; *see also Bloomer v. Liberty Mutual Ins. Co.,* 445 U.S. 74, 77, 100 S.Ct. 925, 63 L.Ed.2d 215 (1980). For the reasons that follow, the court need not resolve whether this requirement was met in the instant case. *Com-*

A second focus is on who pays the attorneys fees. In fee-shifting cases, the defendant bears the burden of compensating the plaintiff's counsel, while in common fund cases, the defendant pays a lump sum to extinguish any claim against it both for damages and attorneys fees. *See In re Washington Public Power Supply Sys. Sec. Litigation*, 19 F.3d 1291, 1299–1300 (9th Cir.1994) Accordingly, "[t]he common fund theory does not impose additional liability on the losing defendant," *Knight v. United States*, 982 F.2d 1573, 1579 (Fed.Cir.1993), and, as such, "there is no direct or immediate danger of unduly burdening the defendant," *Skelton v. General Motors Corp.*, 860 F.2d 250, 254 (7th Cir. 1988), *cert. denied*, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989). *See also Florin v. Nationsbank of Georgia*, 34 F.3d 560, 563 (7th Cir.1994). Finally, the rationale underlying the awards in these two types of cases is fundamentally different. In the typical fee-shifting case, the award is designed to encourage private enforcement of substantive rights, by allowing plaintiffs to obtain counsel and not have their awards diminished by the expense of vindicating their rights. By contrast, common fund claims, like suits for contribution, effectuate a simple equitable notion—that those who have benefitted from the litigation should share in its costs. *Knight*, 982 F.2d at 1580.

Consistent with the taxonomic paradigm outlined above,[14] this court concludes that this case is most analogous to a fee-shifting matter. First, the Agreement did not create an identifiable "common fund," but merely provided for the payment of damages in two forms—cash from the Treasury and benefits to be received in kind as the result of future Congressional appropriations. Neither form of compensation was distributed to individuals not parties to this litigation—the $5.5 million in cash and interest was distributed only to the named plaintiffs, while the Congressional appropriation was not distributed to anyone, but rather was used directly to renourish the beach, thereby conferring benefits on not only plaintiffs and the adjoining landowners, but the general public, as well. *Compare Knight*, 982 F.2d at 1581; *Holbrook*, 748 F.2d at 1175–76.[15] Second, under the Agreement, it is not plaintiffs, but rather defendant, who is paying the attorney fees. Truly the sockdolager here, this feature is the heart of what sets this case apart from the typical common fund case, raising the specter here, not found in common fund cases, that an improper fee award would unduly burden defendant. *Compare Edelman*, 147 F.R.D. at 220. Finally, in focusing on the underlying rationale for the award here, it is notable that neither the mechanics of the fee award itself, nor the Agreement from which it springs, would require all those who have benefitted from the settlement to share any costs. To the contrary, those individuals whose beaches were repaired, but who were not parties to this litigation, incurred no financial obligation under the Agreement or otherwise; their recovery is undiminished. Thus, the rationale ordinarily underlying a common fund case is missing here—any unjust enrichment occasioned by the renourishment of the beaches is not remedied by the Agreement.

pare *National Treasury Employees Union v. Nixon*, 521 F.2d 317, 321 (D.C.Cir.1975) (finding that Congressional appropriation for retroactive pay increases to 3.5 million Federal employees resulted in creation of common fund) *with Holbrook v. Pitt*, 748 F.2d 1168, 1174–75 (7th Cir. 1984) (finding no common fund where moneys appropriated for HUD were to be used to pay retroactive rent subsidies under settlement).

14. Similar requirements for the application of the common fund doctrine are discussed at 10 *Moore's Federal Practice* § 54.171[2][a] (Mathew Bender 3d ed.2002).

15. Indeed, these adjoining landowners are only incidental beneficiaries of this litigation, who, under traditional common fund jurisprudence, would be under no obligation to share the legal expenses. As testimony in this case verifies, these landowners received benefits only because there was no way to effectuate a beach renourishment without repairing the entire beach. Plaintiffs thus sought the renourishment not to benefit their neighbors, but rather as the sole means of renovating their own properties. In similar circumstances, the case law establishes that the common fund doctrine is inapplicable. *See, e.g., Morganroth & Morganroth v. DeLorean*, 213 F.3d 1301, 1318–19 (10th Cir.2000); *Capital Bancshares, Inc. v. United States*, 957 F.2d 203, 208–09 (5th Cir.1992); *see also* 1 *Derner and Wolf. Court Awarded Attorneys Fees* ¶ 2.05[2] (2001); 10 *Moore's Federal Practice* § 54.171[2][a][iii] (Mathew Bender 3d ed.2002).

Accordingly, in the circumstances of this case, all roads lead to Rome—the principles applicable in fee-shifting cases are most directly analogous in determining what is a "reasonable" fee here and shall be applied by this court.[16]

### b. The Fee-Shifting Principles Applicable Here

Having found that this case should be guided by statutory-fee shifting principles, the next task is to describe those *regulae*. In the context of statutory fee-shifting cases, the Supreme Court has consistently recognized that a "reasonable" fee is to be a "fully compensatory fee," *Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), and is to be "calculated on the basis of rates and practices prevailing in the relevant market." *Missouri v. Jenkins*, 491 U.S. 274, 286, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989); *see also Raney*, 222 F.3d at 932; *Rupert v. Secretary of the Department of Health and Human Services*, 52 Fed.Cl. 684 (2002). Fleshing these principles out, the Supreme Court, in construing a wide variety of fee-shifting statutes, has enthusiastically endorsed use of the lodestar figure—the product of billed hours times an hourly rate—as the starting point for determining the amount of a reasonable fee. Hence, in *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933, the Court said that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate," indicating further that "[t]his calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services." [17]

That said, the Court in *Hensley* also stated that the lodestar "does not end the inquiry," *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933, noting that, on suitable occasions, "there remain other considerations that may lead the ... court to adjust the fee upward or downward." *Id.* Indeed, prior to the 1990s, courts readily considered various factors in deciding whether to enhance or reduce the lodestar. In one of the most commonly relied upon formulations, the Fifth Circuit, in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974), adopted the elements set forth in the ABA Model Code of Professional Responsibility DR2–106(B) as guidelines for determining the size of an appropriate attorneys fee, including "time and labor required," "the amount involved and the results obtained," and whether the fee actually contracted by the plaintiff was fixed or contingent. 488 F.2d at 718. Others factors cited by that court included the novelty and difficulty of the questions presented, the skill requisite to respond to those issues, the experience, reputation and ability of the attorneys, as well as the "undesirability" of the case. 488 F.2d at 718–719; *see also Hensley*, 461 U.S. at 434 n. 9, 103 S.Ct. 1933. These factors were cited in the legislative history accompanying the passage of the Civil Rights Attorney's Fees Act and, for a time, were commonly employed in cases involving fee disputes under that statute. *See Hensley*, 461 U.S. at 429–430, 103 S.Ct. 1933; *see also Blanchard*, 489 U.S. at 91, 109 S.Ct. 939. At various points and in varying degrees, they also have been applied to set fees in other contexts, including several situations involving settlement agreements.[18]

---

**16.** While other possible bases support this conclusion, *e.g.*, the fact that the Agreement also benefits the public at large and thus does not benefit a group of beneficiaries that is "small in number and easily identifiable," *Boeing*, 444 U.S. at 478–79, 100 S.Ct. 745, the court does *not* rely on the fact that this case would have been controlled by a fee-shifting statute had plaintiffs litigated this matter to completion and prevailed. Rather, the focus here is on the terms of the Agreement, *as executed, and this court does not decide whether a differently-constructed settlement might be governed by common fund principles.

**17.** *See also City of Burlington v. Dague*, 505 U.S. at 562, 112 S.Ct. 2638 ("The 'lodestar' figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence."); *Blanchard v. Bergeron*, 489 U.S. 87, 94, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) ("[W]e have said repeatedly that '[t]he initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.' " (quoting *Blum*, 465 U.S. at 888, 104 S.Ct. 1541)).

**18.** *See, e.g., Wing v. Asarco, Inc.*, 114 F.3d 986, 988–89 (9th Cir.1997) (settlement agreement to pay "reasonable attorney's fees"); *Western Shoshone Identifiable Group v. United States*, 228

But, over the last fifteen to twenty years, the Supreme Court has steadily whittled down the *Johnson* factors, depriving them of much of their vitality in fee-shifting cases. The Court foreshadowed this approach in *Hensley*, cautioning that reliance on many of the *Johnson* factors would lead to "double-counting" because "many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Hensley*, 461 U.S. at 434 n. 9, 103 S.Ct. 1933. In *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), the Court made explicit what it had previously implied, specifically holding that the novelty or complexity of the issues presented, and generally the quality of representation, do not provide a basis for enhancing the lodestar. 465 U.S. at 899, 104 S.Ct. 1541; *see also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 566, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), ("[O]verall quality of performance ordinarily should not be used to adjust the lodestar."); *Kelly v. City of Oakland*, 198 F.3d 779, 786 (9th Cir.1999). Likewise, the *Blum* court stated that the "results obtained" ordinarily is subsumed within the lodestar amount and should not be an independent basis for increasing the fee amount. 465 U.S. at 900, 104 S.Ct. 1541; *see also Fischer v. SJB–P.D. Inc.*, 214 F.3d 1115, 1119 (9th Cir.2000); *Rupert*, 52 Fed.Cl. 684; *Persyn v. United States*, 36 Fed.Cl. 708, 715 (1996).

More recently, in *Dague, supra*, the Supreme Court unequivocally held that, when granting attorneys fees under the fee-shifting provisions of the Solid Waste Disposal Act and the Clean Water Act, courts may not enhance the lodestar amount to reflect risk of loss or contingency. The Court began its analysis by reaffirming its "strong presumption" that the lodestar represents the "reasonable fee" promised in most fee-shifting provisions, observing that the fee applicant who seeks enhancement "has the burden of showing that 'such an adjustment is *necessary* to the determination of a reasonable fee.'" 505 U.S. at 562, 112 S.Ct. 2638 (quoting *Blum*, 465 U.S. at 898, 104 S.Ct. 1541). It then held that enhancement for contingency "would likely duplicate in substantial part factors already subsumed in the lodestar." *Id.* Risk of loss, the Court reasoned, is the product of two factors: the legal and factual merits of the claims, and the difficulty of establishing those claims. *Id.* at 562, 112 S.Ct. 2638. It found that the second factor is ordinarily reflected in the lodestar itself through the number of hours spent on the case, or in the higher hourly rate of an attorney especially skilled in the area of law. The first fact, the Court opined, should also not be reflected in an enhancement, because if it were, attorneys would have "the same incentive to bring relatively meritless claims as relatively meritorious ones." *Id.* at 563, 112 S.Ct. 2638. In the court's view, such a result would penalize parties with the strongest defenses—under risk analysis, such defendants, if they lost, would be exposed to higher multiples. *Id.* at 563, 112 S.Ct. 2638.[19] The Court thereby concluded that statutory fees should not be enhanced for risk. *See also Venegas v. Mitchell*, 495 U.S. 82, 87, 110 S.Ct. 1679, 109 L.Ed.2d 74 (1990).[20]

---

Ct.Cl. 26, 652 F.2d 41, 47 (1981) (citing *Cherokee Nation v. United States*, 174 Ct.Cl. 131, 355 F.2d 945, 953–54 (1966); *White Mountain Apache Tribe of Arizona v. United States*, 30 Fed.Cl. 8, 13 (1993)) (litigation under the Indian Claims Commission Act), *aff'd*, 31 F.3d 1176 (Fed.Cir.1994), *cert. denied*, 513 U.S. 929, 115 S.Ct. 319, 130 L.Ed.2d 280 (1994).

**19.** *See also Delaware Valley*, 478 U.S. at 557, 106 S.Ct. 3088; *Washington Public Power*, 19 F.3d at 1301 n. 10 ("The stronger the defense, the higher the risk involved in bringing the suit and the greater the multiplier necessary to compensate plaintiff's attorney for bringing the action.").

**20.** *Dague* has since been extended by other courts to apply to various federal fee-shifting statutes and agreements. *See, e.g., Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1048 (9th Cir.2000); *Rutherford v. Harris County, Texas*, 197 F.3d 173, 193 (5th Cir.1999). By contrast, a majority of the circuits have ruled that *Dague* does not apply in common fund cases. *See, e.g., Florin*, 34 F.3d at 564; *Washington Public Power*, 19 F.3d at 1299. To be sure, the risk of loss here is somewhat different than that encountered under a typical contingent fee arrangement. Indeed, unlike the typical settlement agreement, the Agreement here introduced an additional level of risk into this matter as plaintiffs, and derivatively their attorneys, were to obtain the judgment and other benefits identified in the Agreement only if the Congress appropriated at least $8,591,600 for the Project. That

While some courts have observed that "the lodestar method is a tool, not a straight-jacket," *Coutin v. Young & Rubicam Puerto Rico, Inc.*, 124 F.3d 331, 337 (1st Cir.1997), in reality, the Supreme Court has left "very little room" to maneuver for those seeking an enhancement of the basic lodestar fee. *Stewart v. Gates*, 987 F.2d 1450, 1453 (9th Cir. 1993); *see also Walker v. U.S. Dept. of Housing and Urban Development*, 99 F.3d 761, 771–72 (5th Cir.1996); *Rupert*, 52 Fed.Cl. 684. That is because, as explained above, the lodestar figure encompasses most, and arguably all, of the relevant factors historically regarded as marking a "reasonable" attorneys fee. Nevertheless, the Supreme Court potentially has left a little wiggle room, implying, albeit in *dicta*, that considerations such as "the important factor of the results obtained" might lead a court permissibly to adjust a fee upward. *Blum*, 465 U.S. at 897 & n. 14, 104 S.Ct. 1541. Indeed, several courts have gone so far as to suggest that "exceptional results" is the only permissible factor to be considered in adjusting the lodestar figure.[21] Other cases hold forth the prospect that a second factor—the "undesirability" of a case—has survived the Supreme Court's parsimony regarding enhancements and might yet impact on the reasonableness of a fee award. The applicability of these remaining factors is best considered in reviewing the lodestar calculation itself, to which the court now proceeds.

### B. The Anatomy of the Award

In calculating the award here, three sets of issues remain: those arising from the basic lodestar calculation; those involving an enhancement of the lodestar for delay; and those offering the possibility that some multi-

ple of the lodestar may be awarded. The court will deal with these sets of issues *seriatim*.

### 1. The Basic Lodestar Calculation

The lodestar approach contemplates judicial ascertainment of "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933; *see also View Engineering, Inc. v. Robotic Vision Systems, Inc.*, 208 F.3d 981, 987 n. 7 (Fed. Cir.2000). In implementing this lodestar approach, this court calculates the time counsel spent on the case, subtracts duplicative, unproductive, or excessive hours, and then applies prevailing rates in the community (taking into account the qualifications, experience, and specialized competence of the attorneys involved). *See Pennsylvania Envt'l Defense*, 152 F.3d at 231–32; *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir.1998). In this process, the attorneys' contemporaneous billing records constitute the usual starting point, but the court's discretion is by no means shackled by those records. For example, "it is the court's prerogative (indeed, its duty) to winnow out excessive hours, time spent tilting at windmills, and the like." *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 296 (1st Cir.2001); *see also Hensley*, 461 U.S. at 434, 103 S.Ct. 1933.

According to the billing records provided to the court, Gray Harris has expended 13,048.25 hours in this case, which, at their historic rates (the reasonableness of which is uncontested), yields a lodestar of $1,994,277.[22] Defendant urges this court to reduce this figure for several reasons.

there was more risk here than usual, however, does not fundamentally alter the analysis employed by the Supreme Court in determining whether an enhancement may be based on the assumption of risk. Accordingly, in the court's view, the type of contingent risk encountered here does not set this case apart from *Dague*.

**21.** *See, e.g., Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 557 (7th Cir.1999); *Pennsylvania Env'tl Defense Found. v. Canon–McMillan Sch. Dist.*, 152 F.3d 228, 232 (3d Cir.1998).

**22.** From the beginning of this matter until October 28, 1999, the date of the settlement, these

records indicate that plaintiffs had incurred $1,949,196.50 in attorneys fees at their attorneys' historic rates, with additional fees expended from October 29, 1999, to January 11, 2001, again at historic rates, of $45,080.50. Thus, the lodestar calculation here preliminarily yields a total of $1,994,277 in attorneys fees. These records also reveal considerable expert fees and costs. Defendant initially contested these fees and costs, as well, but on the eve of the evidentiary hearing, this matter was resolved by the parties.

Initially, it argues that the time Gray Harris billed with respect to Interrogatory 8 should not be included in the lodestar. Recall that prior to the settlement of this case, Interrogatory 8 was the subject of a protracted and acrimonious discovery dispute, with plaintiffs providing various responses to that interrogatory that were deemed nonresponsive. From the time this interrogatory was served on January 11, 1995, until the time that plaintiffs produced a satisfactory response almost two years later, Judge Miller ordered plaintiffs to comply with the discovery request on five separate occasions, held four status conferences to discuss compliance, and twice specifically granted defendant's motion to compel answers to the interrogatory. *See Applegate v. United States,* 35 Fed.Cl. 47, 55 (1996). Eventually, the court determined that plaintiffs' noncompliance with its orders was willful, and, on August 9, 1996, ruled, in sweeping, unequivocal language, that "Plaintiffs are on notice that no cost whatsoever associated with complying with Interrogatory 8 will ever be borne by the Government, none whatsoever." Defendant contends that these sanctions are law of the case and should be respected in the lodestar calculation. Plaintiffs retort that there should be no such reduction of fees because the sanctions were improperly assessed and, at all events, the parties, in the course of negotiating the Agreement, bargained away the sanction. They claim that the latter point is illustrated by the fact that the Agreement fails to mention the sanctions.

■ This court refuses to disturb Judge Miller's sanctions rulings, finding, as defendant urges, that the "law of the case" doctrine fully applies here. That principle "is a judicially created doctrine," under which "a court will generally refuse to reopen or reconsider what has already been decided at an earlier stage of the litigation." *Suel v. Secretary of Health and Human Services,* 192 F.3d 981, 984–85 (Fed.Cir.1999); *see also*

*Mendenhall & CMI Corp. v. Barber–Greene Co.,* 26 F.3d 1573, 1582 (Fed.Cir.1994), *cert denied,* 513 U.S. 1018, 115 S.Ct. 581, 130 L.Ed.2d 496 (1994). To be sure, the doctrine is more normative than binding—the Supreme Court has instructed that the doctrine " 'merely expresses the practice of courts generally to refuse to reopen what has been decided,' but does not 'limit [ ] their power.' " *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (quoting *Messenger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912) (Holmes, J.)); *see also Drury v. United States,* 52 Fed.Cl. 402, 404–05 (2002). Yet, in the interests of judicial economy and to promote consistency of decision, most courts are loathe to relitigate matters already adjudicated absent some indication of extraordinary circumstances. *See Christianson,* 486 U.S. at 817, 108 S.Ct. 2166; *Mendenhall,* 26 F.3d at 1582; 18B *Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction 2d* § 4478 (2d ed.2002).

Certainly, a reassignment to another judge should not be viewed as declaring open season on relitigating any prior rulings with which a party disagrees. *See Best v. Shell Oil Co.,* 107 F.3d 544, 546 (7th Cir.1997) (stating the law of case doctrine "reflects the rightful expectation of litigants that a change in judges midway through a case will not mean going back to square one"). Indeed, the interests underlying the "law of the case" doctrine seemingly are at their zenith, where, as here, another judge, prior to reassignment, exercises discretion in addressing perceived misfeasance. *See, e.g., Williams v. Commissioner,* 1 F.3d 502, 503–04 (7th Cir. 1993).[23] Nonetheless, arguing that extraordinary circumstances exist here, plaintiffs assert that the court should act "to avoid clear error and prevent manifest injustice." However, in support of this claim, plaintiffs offer

---

**23.** In *Williams,* Judge Posner observed that law of the case considerations resonate particularly where a prior ruling was based upon an exercise of discretion, noting that the deference accorded such exercises of discretion recognizes that different judges might react to the same circumstances differently and yet not commit reversible error. 1 F.3d at 503; *see also* 18B *Charles Alan*

*Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction 2d* § 4478 at 637 (2d ed.2002) (noting that the "simple principle of disciplined self-consistency" is "augmented by comity concerns when one judge … is asked to reconsider the ruling of a different judge").

little more than a rewarmed version of the same excuses they presented to Judge Miller, palliatively respiced, to be sure, with their attorneys' apodictic testimony at the evidentiary hearing that they did not intend to willfully disobey her discovery orders. Judge Miller, however, carefully reviewed essentially the same facts and protestations and concluded otherwise. Stripped of its toppings, plaintiffs' assertions before this court amount to nothing more than a bald request for a reconsideration of her rulings. That this court will not do.[24]

■ Plaintiffs next assert that the sanctions imposed by Judge Miller were waived under the Agreement. This assertion, however, begs the question are such sanctions waivable? The courts are relatively uniform in holding that parties may not bargain away a court-imposed sanction that is non-monetary or payable to the court, *see, e.g., Clark Equip. Co. v. Lift Parts Mfg. Co., Inc.,* 972 F.2d 817, 819 (7th Cir.1992). They, however, are in significant disagreement when a monetary sanctions flows not to the court, but to a party. Several cases, some of which analogize the situation to the settlement of a tort action, hold that the beneficiary of a court-imposed monetary sanction may agree to waive that sanction, *see, e.g., Clark Equipment,* 972 F.2d at 819; while other decisions, stressing the need to preserve judicial integrity and compliance with the rules of procedure, hold otherwise, *see, e.g., Perkins v. General Motors Corp.,* 965 F.2d 597, 600 (8th Cir.1992), *cert. denied,* 506 U.S. 1020, 113 S.Ct. 654, 121 L.Ed.2d 581 (1992). In this circuit, this issue is *terra incognita.*

It is unclear whether the sanctions imposed by Judge Miller in this case are the sort that any court would hold is settleable—arguably they may be viewed as non-monetary as they do not require the offending parties to pay money, but rather to forego a benefit. But, assuming, *arguendo,* that they are settleable, there is nothing in the Agreement that suggests that such a bargain was struck here. Given the length and heated

nature of the discovery dispute, as well as the tenor of Judge Miller's orders in response thereto, it is highly unlikely—incredible, actually—that such a contentious issue would be resolved in the Agreement *sub silentio.* Indeed, the same considerations that cast a shadow on the notion that a court-imposed sanction may be bargained away, among them, that a judicial decree is "not merely the property of private litigants," *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership,* 513 U.S. 18, 26, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994), indisputably command that this court ought not *imply* such an agreement. In fact, contrary to plaintiffs' importunings, it is the court's view that, giving full effect to the Agreement, any fees associated with sanctioned conduct are *per se* not "reasonable" and, therefore, unrecoverable. As such, in the absence of any explicit waiver of the sanctions in the Agreement, this court construes the phrase "reasonable" attorneys fees as not including fees associated with Interrogatory 8.

Turning to more mundane matters, the parties also disagree as to the amount of fees properly attributable to that interrogatory. Combing the billing records, defendant has identified $190,702 in such fees, while plaintiffs claim that figure should be only $92,064. The difference between these figures is driven primarily by the parties' distinctly different views regarding the breadth of the sanctions. According to plaintiffs, although Interrogatory 8 broadly asked "the amount of property that has been lost or taken since each Plaintiff purchased the property," the discovery dispute concerned only the two areas in which plaintiffs' response to that interrogatory were deemed deficient—dune and bluff loss and property loss resulting from the state's movement of the Coastal Construction Control Line. As indicated above, however, Judge Miller's sanction orders are not so limited and, in particular, make no distinction between the costs associated with reasonably complying with interrogatory 8 and those unreasonably incurred.[25] Accordingly, in the exercise of

---

**24.** Hesitant to go down this road even a little, the court, nonetheless, observes that, in light of the court's numerous conferences and orders on this subject, plaintiffs' claim that the situation regarding Interrogatory 8 was all one big misunderstanding has a decidedly hollow ring.

**25.** Aside from the language quoted above, the formal order that initially imposed the sanction

its discretion, and based upon its review of the record in this case, the court will exclude from the lodestar all time associated in any way with Interrogatory 8, and accepts defendant's figure of $190,702 as the proper amount attributable to these efforts.

Defendant next asserts that the lodestar should be reduced by eliminating hours expended on three matters that, in its estimation, did not contribute to the successful outcome of the case: (i) plaintiffs' unsuccessful efforts to recuse Judge Miller; (ii) their failed appeal of a sanction order; and (iii) their withdrawn motion for sanctions against defendant. Defendant calculates that the hours associated with these tasks translate into approximately $82,000 in fees that should not be recovered. Plaintiffs argue that these fees are reasonable and thus appropriately recovered under the Agreement. They assert that defendant is seeking improperly to inject into the Agreement the statutory concept of a "prevailing" party and the limitations that the case law has associated therewith. On this count, plaintiffs have the better case.

While, as observed above, the case *sub judice* is analogous to a fee-shifting case, care must be taken lest this analogy be carried too far. In particular, there is no requirement in the Agreement akin to the "prevailing party" language found in some fee-shifting statutes. Yet even if the case law applying this requirement were applicable here, perhaps on the notion that a "prevailing party" requirement is implicit in what is "reasonable,"[26] there still would be no basis for excluding the time cited by defendant from the lodestar calculation. For example, in *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933, in dealing with a "prevailing party" statute, the Supreme Court emphasized that a party could receive a full measure of attorneys fees even if it did not prevail on every ground in support of a claim, stating "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters."[27] Relatedly, the courts have concluded that when a plaintiff receives the result sought, the lodestar cannot be adjusted downward simply because the plaintiff did not prevail on every tactical maneuver attempted to obtain the result. *See, e.g., Perry v. Bartlett,* 231 F.3d 155, 163 (4th Cir.2000) (finding the district court did not abuse its discretion in awarding attorneys fees to a prevailing party for an earlier, unsuccessful interlocutory appeal), *cert. denied,* 532 U.S. 905, 121 S.Ct. 1229, 149 L.Ed.2d 138 (2001); Conte at § 4.18 (citing cases). Thus, the courts generally have rejected a "mechanical claim-chopping approach" of the sort advocated by defendant here. *See Lenard v. Argento,* 808 F.2d 1242, 1245 (7th Cir.1987).

While, with perfect 20–20 hindsight, it may be clear now that the tasks identified by defendant were ill-conceived, this court finds that these matters were not so divorced from plaintiffs' ultimate success in this litigation as to lead to a further reduction in the lodestar calculation. *See Cabrales v. County of Los Angeles,* 935 F.2d 1050, 1053 (9th Cir.1991) ("[A] plaintiff who is unsuccessful at a stage of litigation that was a necessary step to her ultimate victory is entitled to attorney's fees even for the unsuccessful stage."). As was

---

contained no mention of an apportionment, noting instead that "the Government will not be liable for any expert or attorneys' fees and costs incurred by plaintiffs relating to defendant's Interrogatory No. 8." *Applegate v. United States,* 35 Fed.Cl. 47, 58 (1996).

26. On several occasions, the Supreme Court has implied a "prevailing party" requirement even if the express statutory language did not so provide. *See, e.g., Ruckelshaus v. Sierra Club,* 463 U.S. 680, 683–94, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983). Research reveals, however, that these cases ordinarily deal with the question whether a losing party may be allowed to recover fees where a statute provides for a fee award

when "appropriate" or "in the interest of justice." *See* 1 *Derner and Wolf, Court Awarded Attorneys Fees* ¶ 8.02[2][b] (2001). As such, these cases arguably are distinguishable.

27. *See also id.* at 434, 103 S.Ct. 1933; *City of Riverside v. Rivera,* 477 U.S. 561, 569, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986); *Davis v. Locke,* 936 F.2d 1208, 1214 (11th Cir.1991) (finding it appropriate not to reduce attorneys' fee award when the plaintiff presented five legal theories of liability, but prevailed on only one of them); 1 *Alba Conte, Attorney Fee Awards* § 4.17 (2d ed. 1993) (Conte).

recently stated by the First Circuit, albeit in a different context—

> The practice of law is not a mechanical exercise (like, say, kicking a foot press), and a reviewing court must not lean too heavily on hindsight; a lawyer's acts and omissions must be judged on the basis of what he knew, or should have known, at the time his tactical choices were made and implemented.

*Ouber v. Guarino,* 293 F.3d 19, 25 (1st Cir. 2002) (citing *Bell v. Cone,* —— U.S. ——, ——, 122 S.Ct. 1843, 1854, 152 L.Ed.2d 914 (2002)). While this court certainly does not wish to encourage overly aggressive tactics, the fact remains that, unlike plaintiffs' actions with respect to Interrogatory 8, there has been no showing that the tasks identified by defendant were unreasonable when originally conceived and effectuated. Nor is there any indication that these actions were frivolous or otherwise undertaken in bad faith. Accordingly, this court refuses to segregate the fees associated with these activities from the overall hours billed by Gray Harris.

Finally, defendant bemoans the quality of the billing records submitted by plaintiffs' attorneys, arguing that the lodestar should be reduced due to the inadequacy of various entries therein. To be sure, plaintiffs have the burden of submitting evidence to support the number of hours their attorneys expended. *See Delaware Valley,* 478 U.S. at 564, 106 S.Ct. 3088. Regarding this requirement, the Supreme Court has explained that an attorney "should exercise 'billing judgment' with respect to hours worked . . . and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." *Hensley,* 461 U.S. at 437, 103 S.Ct. 1933. At the same time, the Court emphasized that an attorney is "not required to record in great detail how each minute of his time was expended," but "at least" should "identify the general subject matter of his time expenditures." *Hensley,* 461 U.S. at 437 n. 12, 103 S.Ct. 1933; *see also Naporano*

*Iron and Metal Co. v. United States,* 825 F.2d 403, 404 (Fed.Cir.1987) ("Contemporaneous records of attorney's time and usual billing rates, as well as a breakdown of expenses, are necessary in order to determine the reasonableness of the charges."). Relying on *Hensley,* this court has added that the records must "be in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and the need for the service, and the reasonable fee to be allowed." *Martin v. United States,* 12 Cl.Ct. 223, 227 (1987); *see also KMS Fusion, Inc. v. United States,* 39 Fed.Cl. 593, 601 (1997); *Design and Production, Inc. v. United States,* 20 Cl.Ct. 207, 219–20 (1990); *Davis v. Secretary of Health and Human Services,* 19 Cl.Ct. 395, 402 (1990).

Seeking to separate wheat from chaff, defendant urges this court to exercise its discretion to reduce the lodestar by at least 40 percent in order to deny plaintiffs recovery for "vague and block-billed" entries in their contemporaneous billing records.[28] In this regard, defendant has highlighted several generalized entries that appear repeatedly in plaintiffs' submitted records, such as "meeting with attorneys," "preparing for team meeting," and "working on case." To buttress this claim, defendant relies on the testimony of its expert witness, Ms. Ann F. Gillooly, who testified that approximately 25 percent of plaintiffs' entries for 1995 and 1996 should be eliminated as unreasonable because they were "block billed," "excessive," or "duplicative." Plaintiffs respond that their testimony established that their fee submissions are in accord with Gray Harris' regular billing practices, which practices, they further contend, comport with general billing practices in their legal community, as well as the requirements of the case law. Plaintiffs discount the testimony of Ms. Gillooly, noting that she testified that her opinion of the billing records was based not on normal billing practices, but rather corporate standards that she developed while working

---

**28.** As defendant notes, numerous courts have held that where an hour-by-hour review of all the time claimed is impossible, a court may, to reflect improper billing practices, simply apply a percentage of reduction to all time claimed. *See,* *e.g., Freiler v. Tangipahoa Parish Bd. of Educ.,* 185 F.3d 337, 349 (5th Cir.1999), *cert. denied,* 530 U.S. 1251, 120 S.Ct. 2706, 147 L.Ed.2d 974 (2000).

in the general counsel's office of Mobil Corporation.

After carefully reviewing the instant record, the court agrees that some of the entries in the billing records are somewhat cryptic or short on details. In at least some instances, however, the lack of detail is cured by cross-checking the time sheets for the various attorneys who worked on this case and by reviewing docket entries to determine what specific filings were being made at particular times. Moreover, some of the specific entries cited by defendant appear to have more than adequate detail.[29] Assessing whether the remaining entries cited by defendant are adequately documented is complicated by the lack of a definitive standard. The case law is decidedly murky and runs the gamut, with some decisions clearly disallowing entries similar to those encountered here, and others finding the same types of entries acceptable.[30] Placing the Federal Circuit and this court on this continuum is no easy task, but it appears that those courts tend toward the somewhat more lenient side of the spectrum. Thus, in rejecting arguments that documentation was insufficiently itemized, the Federal Circuit and this court have tended to emphasize that all that is required is "typical billing records." *Beta Systems, Inc. v. United States*, 866 F.2d 1404, 1406–07 (Fed.Cir.1989); *see also Community Heating & Plumbing Co., Inc. v. Garrett*, 2 F.3d 1143, 1146 (Fed.Cir.1993);

*KMS Fusion, Inc.*, 39 Fed.Cl. at 601. And when they have rejected documentation for a fee, those courts have generally been faced with reconstructed or other forms of *post hoc* records, which, by their nature, include far less detail than the contemporaneous records presented here. *See, e.g., Naporano*, 825 F.2d at 404 (rejecting summary document that showed total billings for the month and noting that "[t]he court needs contemporaneous records of exact time spent on the case, by whom, their status and usual billing rates.").

Based on what it can glean from these cases, this court finds that the entries supporting plaintiffs' fee submission range from adequate to barely adequate—but adequate, nonetheless. In particular, the court finds that, given the overall level of detail, the fact that some of the entries cited by defendant do not list subjects is not disqualifying. *See KMS Fusion*, 39 Fed.Cl. at 600 ("As a practical matter, certain tasks performed by attorneys are not amenable to issue-based recordkeeping. For example, for an attorney to attempt to break down the time spent drafting a complaint on an issue-by-issue basis would not be productive."). In the court's view, this conclusion is consistent not only with the Supreme Court's instructions in *Hensley* and the prior jurisprudence in this circuit, but also with the overarching mandate that the fees awarded here be "reasonable." As such, the court will not reduce the

29. For example, one entry cited by defendant for February 20, 1996, lists 6.5 hours for "Preparing responses and replies to pending motion etc.; reviewing Court Orders;" another, dated August 4, 1995, lists a meeting and identifies, by name, all the participants, including government counsel The latter entry was apparently deemed deficient by defendant because it does not list a subject, although one might reasonably ask why defendant could not check its own records to obtain that information.

30. *Compare Michigan v. U.S. Envt'l Protection Agency*, 254 F.3d 1087, 1093–1095 (D.C.Cir. 2001) (discounting for inadequate documentation, billing documents that included various references to "telephone conferences," "conference calls," and "review record"); *Case v. Unified School Dist. No. 233, Johnson County*, 157 F.3d 1243, 1252 (10th Cir.1998) (finding billing statements for time on "memo," "research," and "draft outline" were too imprecise for fee award); *H.J. Inc. v. Flygt Corp.*, 925 F.2d 257,

260 (8th Cir.1991) (upholding a reduction of hours for entries such as "legal research," "trial preparation," and "met with client"); *with Fischer*, 214 F.3d at 1121 (noting that "plaintiff's counsel can meet this burden—although just barely—by simply listing his hours and 'identifying the general subject matter of his time expenditure.'"); *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 327 (5th Cir.1995) (upholding district court decision to accept time for "pleadings," or "correspondence," noting that "we are mindful that practical considerations of the daily practice of law in this day and age preclude 'writing a book' to describe in excruciating detail the professional services rendered for each hour or fraction of an hour."), *cert. denied*, 516 U.S. 862, 116 S.Ct. 173, 133 L.Ed.2d 113 (1995); *Rode v. Dellarciprete*, 892 F.2d 1177, 1190 (3d Cir.1990) ("[I]t is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney.").

lodestar calculation further for inadequate documentation.[31]

In sum, the court finds that plaintiffs' award shall be reduced by any fees and costs associated in any way with Interrogatory 8, and accepts defendant's figure of $190,702 as the proper amount attributable to these efforts. The court, however, rejects defendant's arguments that the lodestar should be reduced further to reflect the time associated with unsuccessful arguments or the asserted inadequacy of Gray Harris' billing records.[32]

### 2. Enhancement for Delay

■ Plaintiffs next seek to adjust the lodestar to take into account the "delay in payment" of the fees in two alternative fashions: (i) by adjusting the historic fees to reflect the current hourly rates of individuals who still are employed by the firm and the present current value of the personnel no longer with the firm; or (ii) by adjusting their historic fees to present value utilizing compound interest. Neither of these adjustments is appropriate.

Plaintiffs note that, in other settings, courts have readily adjusted historic hourly fees—either to current hourly rates or by an inflation factor—in order to compensate for delay. See, e.g., Missouri v. Jenkins, 491 U.S. at 284, 109 S.Ct. 2463; Conti at § 4.08 (citing numerous cases). None of the cases cited by plaintiffs, however, are apposite. They are not cases against the United States and thus were not required to account for the axiom that "interest cannot be recovered in a suit against the Government in the absence of an express waiver of sovereign immunity from an award of interest." Shaw, 478 U.S. at 311, 106 S.Ct. 2957. Plaintiffs' request to be compensated for "delay" is tantamount to

a request for interest on their attorneys fees. As the Court indicated in Shaw, in which the court barred recovery of a delay enhancement on an award of reasonable attorneys fees, "the force of the no-interest rule cannot be avoided simply by devising a new name for an old institution." 478 U.S. at 321, 106 S.Ct. 2957. More specifically, the court stated "[i]nterest and a delay factor share an identical function. They are designed to compensate for the belated receipt of money." Id. at 322, 106 S.Ct. 2957. Plaintiffs' request for a delay enhancement thus collides with the no-interest rule of Shaw and its progeny. See Chiu v. United States, 948 F.2d 711, 719–20 (Fed.Cir.1991) (refusing to enhance attorneys fee for "adjustment for loss of use of the money by reason of delay"); United States v. Mescalero Apache Tribe, 207 Ct.Cl. 369, 518 F.2d 1309, 1322 (1975), cert. denied, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976); see also 10 Moore's Federal Practice § 54.190[3][e] (Mathew Bender 3d ed.2002) (noting general approval of a delay adjustment, but observing that "[i]f the opponent is the United States, sovereign immunity prevents the implementation of any delay enhancement.").

■ As noted above, in Shaw, the Supreme Court indicated that the no-interest rule may be waived either in a statute or a contract. Shaw, 478 U.S. at 317, 106 S.Ct. 2957. Because waivers of sovereign immunity as to interest must specifically reference such an allowance, a general waiver as to attorneys' fees, without more, does not waive the sovereign's immunity from interest. Shaw, 478 U.S. at 318–19, 106 S.Ct. 2957; see also Preseault, 52 Fed.Cl. at 677.[33] Here,

---

**31.** In so finding, the court rejects the conclusions of defendant's expert, Ms. Ann Gilooly, who testified regarding the adequacy of the billing records in this case. As plaintiff notes, her testimony was based upon audit standards developed by Mobil Corporation during the mid–1990's to assess the performance of law firms that had long-standing and continuous relationships with that company. Under questioning, Ms. Gilooly admitted that her conclusions did not reflect the adequacy of these records for any other purposes, including, notably, what kind of documentation would be considered adequate by courts seeking to determine a "reasonable fee."

**32.** The court also rejects defendant's glancing argument regarding plaintiffs' use of multiple attorneys to perform particular tasks. Based on the complexity of the issues in this case, the court finds that the use of multiple attorneys was reasonable and likely contributed to the ultimate success in this matter.

**33.** Plaintiffs cite various cases in support of its claim for a "delay in payment enhancement." Most of these case involve situations in which courts have awarded interest on a taking judgment in order to ensure "just compensation," and for the reasons discussed are inapplicable

there is neither a waiver in any statute, nor in the Agreement itself—the absence of any reference to interest on attorneys fees is particularly telling given that the Agreement explicitly provides for interest on other parts of the settlement compensation. *Compare Woolf v. Bowles,* 57 F.3d 407, 409 (1995).

To be sure, the courts have ruled that the Fifth Amendment itself provides for interest as an aspect of "just compensation." *Shaw,* 478 U.S. at 317 n. 5, 106 S.Ct. 2957; *see also Smith v. Principi,* 281 F.3d 1384, 1388 (Fed. Cir.2002). But, this conclusion derives from the principle that just compensation is "for the property, and not to the owner." *Monongahela Navigation Co. v. United States,* 148 U.S. 312, 326, 13 S.Ct. 622, 37 L.Ed. 463 (1893); *see also United States v. Bodcaw, Co.,* 440 U.S. 202, 203, 99 S.Ct. 1066, 59 L.Ed.2d 257 (1979). As such, various decisions clearly indicate that "[a]ttorneys' fees and expenses are not embraced within just compensation for land taken by eminent domain." *Dohany v. Rogers,* 281 U.S. 362, 368, 50 S.Ct. 299, 74 L.Ed. 904 (1930); *see also Shaw,* 478 U.S. at 317, 106 S.Ct. 2957; *Calhoun v. United States,* 197 Ct.Cl. 41, 453 F.2d 1385, 1395 (1972); *Preseault,* 52 Fed.Cl. at 677. Accordingly, the enhancement here of attorneys fees for delay is not a matter of constitutional command.

Therefore, in the court's view, there is no statutory, contractual or constitutional basis for enhancing the lodestar for the asserted "delay in payment." [34]

### 3. Enhancement for Other Factors

■ As noted above, some cases suggest that the factors not reflected in the lodestar, which, in the "rare" and "exceptional" case, may lead to enhancement of the lodestar, are two-fold: the exceptional results obtained and the undesirability of the case. In general, enhancements must be supported by specific evidence in the record and detailed findings by the lower court. *Id.; Delaware Valley,* 478 U.S. at 565, 106 S.Ct. 3088. The applicant bears the burden of demonstrating that the lodestar amount must be enhanced to constitute a reasonable fee. *Blum,* 465 U.S. at 898, 104 S.Ct. 1541.

Plaintiffs first claim that the lodestar should be enhanced for the exceptional results they obtained. As noted above, the Supreme Court has, on several occasions, left open the possibility that, in the right circumstances, such results could lead to an enhancement of the lodestar. *See Farrar v. Hobby,* 506 U.S. at 103, 114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992); *Hensley,* 461 U.S. at 436, 103 S.Ct. 1933. Nonetheless, a review of the case law suggests that this exception is more likely to be described than employed and that, relatedly, proving entitlement under this factor is no easy matter. For example, in *Blum,* the court cautioned that "[b]ecause acknowledgment of the 'results obtained' generally will be subsumed within other factors used to calculate a reasonable fee, it normally should not provide an independent basis for increasing the fee award." 465 U.S. at 900, 104 S.Ct. 1541; *see also Delaware Valley,* 478 U.S. at 565, 106 S.Ct. 3088. "Exceptional results are results

where a plaintiff seeks interest on an attorney's fees. *See, e.g., Jacobs v. United States,* 290 U.S. 13, 16–17, 54 S.Ct. 26, 78 L.Ed. 142 (1933). Others of the cases cited involve attorneys fees, but are still inapposite as they do not involve awards against the United States or its agencies and thus present no issues involving sovereign immunity. *See, e.g., Washington Public Power,* 19 F.3d at 1305; *Walker,* 99 F.3d at 773. The one case that applies compound interest to an attorneys fees award against the United States, *Florida Rock Industries v. United States,* 2000 WL 331830 (March 28, 2000), does so in summary fashion, without considering whatsoever the Supreme Court precedent and other case law to the contrary. Accordingly, this court chooses not to follow this decision. The court also observes that in invoking these authorities, plaintiffs seem

to turn a blind eye to the fact that their recovery is based upon the Agreement and not a judicial finding of "just compensation" under the Fifth Amendment.

**34.** The court further notes that there is no evidence of excessive delay on the part of the defendant. To be sure, this litigation has been long and slow. But, given the nature of the allegations, the complexity of the litigation, and the unusual nature of the resolution of this case, the delay is not unreasonable. Defendant has pursued this case vigorously, as is its right; there is no evidence, however, that it has dragged out the process through frivolous motion practice or obstructionist tactics.

that are out of the ordinary, unusual, or rare," the Eleventh Circuit has stated, and "results are not exceptional merely because of the nature of the right vindicated or the amount recovered." *Norman v. Housing Auth. of the City of Montgomery,* 836 F.2d 1292, 1302 (11th Cir.1988). Indeed, several courts have held that enhancement for this reason is appropriate only when the fee applicant demonstrates that "it is customary in the area for attorneys to charge an additional fee above their hourly rates for an exceptional result." *Walker,* 99 F.3d at 772; *see also Forshee v. Waterloo Indus., Inc.,* 178 F.3d 527, 532 (8th Cir.1999) ("[T]he fee applicant must do more than establish outstanding service and results."). The latter requirement makes sense because "when an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests." *Delaware Valley,* 478 U.S. at 565–66, 106 S.Ct. 3088; *see also Stewart,* 987 F.2d at 1453; *Earth Island Inst. Inc. v. Southern Cal. Edison,* 838 F.Supp. 458, 464 (S.D.Cal. 1993).

To be sure, plaintiffs' argument for enhancement due to exceptional results has a patina of plausibility. Ultimately, however, this court rejects this enhancement for several reasons. In the first place, it is far from clear that the results here are exceptional. In pure dollar terms, of course, the settlement here is considerable—but the case law suggests that this alone is insufficient. *See, e.g., Norman,* 836 F.2d at 1302; *Copeland v. Marshall,* 641 F.2d 880, 894 (D.C.Cir.1980) ("it is important again to emphasize that a

huge dollar recovery does not itself justify a huge fee award").[35] Of course, during the evidentiary hearing, plaintiffs produced extensive evidence documenting the benefits received as the result of the beach renourishment. For example, the court was presented with a computerized map of the beachfront south of the Port Canaveral jetties, which, as the cursor moved down this map, displayed "before" and "after" pictures of properties and facilities along the beachfront.[36] The results so depicted, while remarkable, are, nonetheless, precisely what plaintiffs set out to accomplish in filing this suit. Accordingly, measured by plaintiffs' own expectations at the outset of the case, the results obtained were not exceptional, but rather reflect what was owed. Indeed, unlike the select few cases in which enhancements have been granted for exceptional results, the settlement here worked no unexpected change in agency policy, so as unexpectedly to impact significantly beyond the confines of this litigation. *Cf. Hyatt v. Apfel,* 195 F.3d 188, 192 (4th Cir.1999) (allowing multiplier of 1.33 where plaintiffs "succeeded in bringing about fundamental change to a recalcitrant agency"); *Shipes v. Trinity Indus.,* 987 F.2d 311, 322 (5th Cir.1993), *cert. denied,* 510 U.S. 991, 114 S.Ct. 548, 126 L.Ed.2d 450 (1993) (enhancement for exceptional results may have been warranted where victory provided future protection against discrimination in the form of "injunctive relief").

In the second place, with all due respect, it is dubious that the results obtained here are solely attributable to the efforts of Gray Harris. In particular, it appears that the amount appropriated by Congress for renourishment exceeded the amount initially requested by

**35.** Indeed, it bears noting that while approximately $30 million was received under the Agreement, plaintiffs' complaint sought $100 million. *Compare Copeland,* 641 F.2d at 894 ("if a substantial monetary judgment was to be expected, that expectation normally is reflected in the hourly rate used to compute the 'lodestar,' and no further adjustment would be necessary").

**36.** The "before" pictures were characterized by remarkable erosion and only gave hint of the beach that had previously existed along these properties by the degree of degradation that was present—collapsed piers and decks, stairwells that once led to the beach hanging off into the

air, buildings whose foundations were being undercut, and restaurants and businesses whose "ocean views" were now far too up close and personal. The "after" pictures, taken after the beach was renourished by the Corps, were just as remarkable for their phoenix-like qualities. They showed a broad and bright sandy beach protectively extending from the front of the same properties, with decks, piers and stairways repaired or replaced, foundations no longer threatened and shore businesses obviously thriving. Plaintiffs further documented what the court might have surmised from looking at these paired pictures by producing a study.

plaintiffs and undoubtedly was affected by the Florida Congressional delegation's desire to benefit all their constituents, as opposed to the individual plaintiffs in this lawsuit. The court does not believe that plaintiffs' attorneys should receive additional compensation based, at least in part, upon this Congressional largess. Moreover, there is absolutely no evidence that "it is customary in the area for attorneys to charge an additional fee above their hourly rates for an exceptional result." *Walker*, 99 F.3d at 772. This point is particularly compelling given the Supreme Court's admonition that a "reasonable" fee is to be "calculated on the basis of rates and practices prevailing in the relevant market." *Jenkins*, 491 U.S. at 283, 109 S.Ct. 2463. While the record suggests that counsel for plaintiffs generally performed admirably and well, the quality of that representation "generally is reflected in the reasonable hourly rate," and does not warrant an upward adjustment in this case. *Blum* 465 U.S. at 889, 104 S.Ct. 1541; *see also Abrams v. Baylor College of Medicine*, 805 F.2d 528, 537 (5th Cir.1986). In short, in the absence of evidence that a private individual would have extracontractually rewarded his counsel with payment in excess of that attorney's hourly rate, this court is disinclined to impose a similar obligation on the United States.

 Plaintiff also seeks enhancement asserting that this case was "unattractive" or "undesirable." The Supreme Court has not yet directly addressed whether this factor is an appropriate basis for enhancing a lodestar fee. To the extent a case's "undesirability" turns on the difficulty of establishing the merits, however, that consideration appears foreclosed by the rationale of the Supreme Court's precedents—as noted in *Dague*, "the difficulty of establishing [the] merits ... is ordinarily reflected in the lodestar—either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so." 505 U.S. at 562, 112 S.Ct. 2638. Splintering these concepts further, however, several cases hold that an enhancement for "undesirability" may apply

where a plaintiff, or the type of case he or she brings, is unpopular and the plaintiff thus "is unlikely to prevail for reasons having nothing to do with the merits of the claim or the quality of the attorney's performance." *Gomez v. Gates*, 804 F.Supp. 69, 75 (C.D.Cal. 1992) (identifying civil rights cases involving the use of allegedly excessive force against unsavory clients as one such category of case).[37] But, arguably, this formulation still implicates a party's ability to prevail on the merits—a lawyer might possess special skills or be required to expend additional hours to compensate for such hardships. On the other hand, in originally identifying this factor, the Fifth Circuit asserted that the "detriment" associated with the handling an unpopular case involves lost goodwill and client opportunities and thus cannot be compensated for by charging for additional hours in the case itself. *See Johnson*, 488 F.2d at 719 (describing this factor as applying where a case is "not pleasantly received by the community or ... contemporaries" that could have "an economic impact on his practice").

Reconciliation of these competing forces is unnecessary, as the facts here demonstrate that Gray Harris was not prosecuting an unattractive case, but rather pursuing a cause *celeb*—the type of case that a firm with local roots likely would embrace and seek to publicize to its clients and prospective clients as an indication of its community involvement. As such, apart from its questionable legality, the court finds that a lodestar enhancement for "unattractiveness" or "undesirability" is wholly unwarranted by the facts of this case.

In light of the foregoing discussion, this court concludes that the case *sub judice* is not one of those "rare" and "exceptional" cases that warrants a multiplier of the lodestar.

### III. Conclusion

This court need go no further. Counsel for both sides performed admirably in presenting their cases on this matter, thereby

---

**37.** *See also Guam Soc. of Obstetricians and Gynecologists v. Ada*, 100 F.3d 691, 699 (9th Cir. 1996), *cert. denied*, 522 U.S. 949, 118 S.Ct. 367, 139 L.Ed.2d 286 (1997); *Alberti v. Klevenhagen*, 903 F.2d 352 (5th Cir.1990); *Johnson*, 488 F.2d at 719.

both facilitating and complicating the decision herein. For the foregoing reasons, this court concludes that plaintiffs are entitled to receive "reasonable" attorneys fees in the amount of $1,803,575. The Clerk shall enter an appropriate judgment.

**IT IS SO ORDERED.**