**AMERICAN FEDERAL BANK, FSB, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 95–498C.

United States Court of Federal Claims.

Nov. 1, 2006.

Howard N. Cayne, Arnold & Porter, LLP, Washington, D.C., for plaintiff. With him on the briefs were David B. Bergman and Michael A. Johnson, Arnold & Porter LLP, Washington, D.C.

Jeffrey T. Infelise, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, Timothy Abraham, Elizabeth Hosford, and Sameer Yerawadekar, Trial Attorneys, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## ORDER FOR ENTRY OF FINAL JUDGMENT

LETTOW, Judge.

A template for calculation of damages in this *Winstar*-related case [1] was established in a post-trial decision issued on September 1, 2006. *See American Fed. Bank, FSB v. United States,* 72 Fed.Cl. 586 (2006) ("*Am-Fed IV*"). First, the recovery awarded plaintiff ("American Federal") for breach of two contracts relating to allowance of regulatory capital consisted of "expectancy damages equal to [plaintiff's] net costs of replac[ing the intangible] capital [allowed by the government to be counted as regulatory capital prior to the Financial Institution Reform, Recovery, and Enforcement Act ('FIRREA') Pub.L. No. 101–73, 103 Stat. 183 (Aug. 9, 1989) (codified in scattered sections of Title 12 of the U.S.Code, including § 1464)], with a tax gross-up, plus incidental losses." *AmFed IV,* 72 Fed.Cl. at 629. Second, the government was awarded an offset for costs in preparing for and responding to rebuttal testimony offered by the bank's expert witness. *Id.* Both the basic award and the offset required further calculations. As to the award, because the court's decision did not follow damage models proffered by American Federal or criticisms of plaintiff's models made by the government's expert witnesses, but rather reflected an amalgam of the models and critiques, the court requested that the parties provide calculations that employed the court's template. Re-

---

1. *See United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

specting the offset, the court requested that the government delineate with precision the expenses incurred in responding to the pertinent rebuttal testimony.

American Federal submitted the requested damage calculations on October 2, 2006, the government responded on October 16, 2006, and American Federal provided a reply on October 24, 2006.[2] With its calculations, American Federal also sought two adjustments to the court's methodology for calculating damages. In that respect, its submission in effect constitutes a *de facto* request for partial reconsideration of the post-trial decision. The government's response to American Federal's calculations of the damages does not join issue with those calculations as such,[3] but the government contests the basis for the calculations by explicitly requesting that the court reconsider its decision on damages and reopen the case to receive additional evidence. Both parties resist the reconsideration requests made by the other. For the reasons set out in this final order for judgment, each of these competing requests for reconsideration is denied.

Also, on September 28, 2006, the government submitted its bill of costs for responding to the bank's rebuttal testimony on calculation of damages. American Federal responded with objections on October 12, 2006. The government's bill of costs is allowed in part and disallowed in part for the reasons explained below.

With the allowed offset, final judgment is ordered in favor of American Federal in the amount of $30,657,030.

### A. Damages

#### 1. *Plaintiff's calculations.*

At the enactment of FIRREA, American Federal had in place a complicated capital structure that relied heavily upon intangible goodwill and subordinated debt, both of which were counted as regulatory capital as a result of contracts into which the bank had entered with the government. *See American Fed. Bank, FSB v. United States*, 62 Fed.Cl. 185, 186–87 (2004) ("*AmFed II*") (post-trial decision on liability). The resulting framework for computing damages proved to be correspondingly complex. The court's specifications for the calculations to be made by the parties involved ten separate steps:

1. Apply the schedule of regulatory capital elided by FIRREA, including both goodwill and subordinated debt, set forth as "Table 1" in *AmFed IV;*[4]

2. Treat the following four tranches of shares of American Federal's common stock as sources of replacement capital:

 a. 2,173,192 shares into which American Federal's Series A subordinated debentures were converted on March 18, 1993;[5]

 b. 2,195,650 shares resulting from the exercise of the Mandatory Purchase Contracts ("MPCs") associated with the conversion of the Series A subordinated debentures on March 18, 1993;[6]

 c. 1,273,955 of the 2,083,955 shares issued in the secondary offering consummated on March 18, 1993 (*i.e.,* the number of shares corresponding to $10,497,389 of the $17,171,189 net proceeds raised);[7] and,

 d. The number of the 2,340,768 shares into which American Federal's Series B subordinated debentures were ultimately converted (after having first been converted into Series I preferred shares) corresponding ratably to the portion of the Series B

---

2. Prior to the submission of the calculations and objections, the court held a hearing on September 14, 2006, at which the parties addressed various technical aspects of the calculations.

3. The government does not challenge any aspect of the plaintiff's calculations of the damages determined in accord with the parameters specified by the court.

4. *See AmFed IV*, 72 Fed.Cl. at 613–14.

5. The number of shares into which the Series A debentures were converted was 2,173,192, not 2,173,912. *Compare American Federal Bank, FSB v. United States*, 68 Fed.Cl. 346, 352 n. 6 (2005) ("*AmFed III*"), *with AmFed IV*, 72 Fed.Cl. at 594, 616.

6. *See AmFed IV*, 72 Fed.Cl. at 594, 616.

7. *See id.* at 594–95, 608, 620.

subordinated debentures' principal that would have been treated as regulatory capital but for the government's breach; [8]

3. Project that but for the breach, the Series A subordinated debentures would have been converted, and the MPCs would have been exercised, on January 14, 2004; [9]

4. Treat, in determining the amount of each tranche of replacement capital for each period, the secondary offering shares as the first tranche to be reduced as a result of the contractual amortization of goodwill, thereby leaving all of the shares resulting from the conversion of the Series A subordinated debentures and the exercise of the MPCs outstanding over the period from March 18, 1993 to January 14, 2004; [10]

5. Compute the cost of each replacement share through and including the third quarter of 1997 as the actual dividends American Federal paid per share of its common stock over that period; [11]

6. Compute the cost of each replacement share for periods after the third quarter of 1997 as American Federal's actual average earnings per share over the first and second quarters of 1997 times a dividend payout ratio of 34%; [12]

7. Compute the benefit of the capital that replaced the Series B subordinated debentures as the "interest that would have been paid on that portion of the debentures that could have been recorded as regulatory capital" each quarter "during [the] six-year period" from 1993 to 1999; [13]

8. Compute the benefit of the goodwill replacement capital through and including the second quarter of 1997 as the average yield on American Federal's assets in a given quarter times the amount of goodwill replacement capital for that quarter; [14]

9. Compute the benefit of the goodwill replacement capital for all periods after the second quarter of 1997 as the 5.67 percent after-tax yield on 10–year Treasury notes issued in 1990 times the amount of goodwill replacement capital for each quarter; [15] and,

10. Compute the cost of replacement capital on an after-tax basis, apply a discount rate of 8.0% to that part of the net costs that occurs after November 1, 2006, the date on which the final judgment in this case was expected to be entered, and then gross the result up for taxation at the marginal rate of 37.35%.[16]

Plaintiff performed the calculation as the court directed, resulting in $27,103,085 as the net cost of American Federal's replacement capital. Plaintiff's Computation of Damages ("Pl.'s Computation") at 3. As noted previously, the mathematical aspects of that calculation have been accepted, but both American Federal and the government proffer competing and contradictory requests for reconsideration of, and adjustments to, these calculations.

2. *American Federal's requested adjustments.*

American Federal asks the court to revisit two of the parameters underlying the cost-of-replacement-capital calculation: (1) the benefit rate applied to the incremental tangible capital American Federal raised, for all periods after the second quarter of 1997 (step 9

---

8. *See id.* at 618–20.

9. *See id.* at 615–16.

10. *See id.* at 615–18, 620; *see also* Hr'g Tr. 12–14 (Sept. 14, 2006).

11. *See AmFed IV*, 72 Fed.Cl. at 616, 619, 620; *see also* Hr'g Tr. 25 (Sept. 14, 2006).

12. *See AmFed IV*, 72 Fed.Cl. at 616–17, 619, 620; *see also* Hr'g Tr. 25–26 (Sept. 14, 2006).

13. *See AmFed IV*, 72 Fed.Cl. at 620.

14. *See id.* at 617; *see also* Hr'g Tr. 8–12 (Sept. 14, 2006).

15. *See AmFed IV*, 72 Fed.Cl. at 617–18, 620, 621; *see also* Hr'g Tr. 8–12 (Sept. 14, 2006).

16. *See AmFed IV*, 72 Fed.Cl. at 621–22, 624–26.

above); and (2) inclusion of the replacement of the Series B subordinated debentures in the calculus of the overall cost of replacing the bank's regulatory capital (part of steps 1, 2d, 5, 6, 7, 8, and 9 above). Pl.'s Computation at 3–9. The government objects to these adjustments, arguing that they amount to a request for reconsideration of the court's decision and a reopening of the record to consider factual matters that should have been presented at trial. Defendant's Motion for Reconsideration and Response to Plaintiff's Computation of Damages ("Def.'s Mot. and Resp.") at 15–20.

The standards applicable for reconsideration of non-final decisions, set out in Rules 54(b) and 59(a) of the Rules of the Court of Federal Claims ("RCFC"), apply to American Federal's requests for adjustments to the decision respecting damages. RCFC 54(b) provides that "any order or other form of decision ... *is subject to revision at any time before the entry of judgment* adjudicating all the claims and the rights and liabilities of all the parties." (Emphasis added.) *See also* Fed.R.Civ.P. 54(b) (identical text). Correlatively, RCFC 59(a)(1) provides that "reconsideration may be granted to all or any of the parties and on all or part of the issues, for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States." RCFC 59(a)(1) also permits the court upon a showing of good cause to "take additional testimony [and] amend findings of fact and conclusions of law or make new findings and conclusions." These rules reflect the precept that "[c]ourts possess inherent power to modify their interlocutory orders before entering a final judgment." *Florida Power & Light Co. v. United States,* 66 Fed.Cl. 93, 96 (2005) (citing *Balla v. Idaho State Bd. of Corr.,* 869 F.2d 461 (9th Cir. 1989) (citing *Marconi Wireless Tel. Co. v. United States,* 320 U.S. 1, 47–48, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943)); *John Simmons Co. v. Grier Bros. Co.,* 258 U.S. 82, 88, 42 S.Ct. 196, 66 L.Ed. 475 (1922)). At an interlocutory stage, the common law provides that the court has power to reconsider its prior decision on any ground consonant with application of the law of the case doctrine. *See Florida Power,* 66 Fed.Cl. at 95, 97 (citing *Exxon Corp. v. United States,* 931 F.2d 874, 877 (Fed.Cir.1991)); *see also Wolfchild v. United States,* 68 Fed.Cl. 779, 785 (2005)).

The law of the case doctrine "protect[s] the settled expectations of the parties and promote[s] orderly development of the case." *Suel v. Sec'y of Health & Human Servs.,* 192 F.3d 981, 984 (Fed.Cir.1999). "Reasons that may warrant departure from the law of the case ... include the discovery of new and different material evidence that was not presented in the prior action, or an intervening change of controlling legal authority, or when the prior decision is clearly incorrect and its preservation would work a manifest injustice." *Intergraph Corp. v. Intel Corp.,* 253 F.3d 695, 698 (Fed.Cir.2001) (citing *Smith Int'l Inc. v. Hughes Tool Co.,* 759 F.2d 1572, 1576 (Fed.Cir.1985)).

■ For the benefit rate applicable to the tangible capital American Federal raised after the second quarter of 1997, the court prescribed use of the 5.67 percent after-tax yield on ten-year Treasury notes issued in 1990 (step 9 above). American Federal requests that this rate be replaced by either the after-tax yield on 10–year Treasury notes issued early in 1993, approximating the date of the March 1993 offering and exchange, or the after-tax yield on medium-term Treasury securities held by CCB Financial Corporation ("CCB"), the entity with which American Federal merged in August 1997. *See* Pl.'s Computation at 3–6. Either rate, American Federal argues, would provide a much stronger link to the benefit of the tangible capital American Federal raised in March of 1993. *Id.* at 4. American Federal implicitly concedes that the trial record does not contain evidence respecting the before-tax yield on ten-year Treasury notes issued in March 1993. The bank contends, however, that a website referenced at trial, and used to generate a printout of rates admitted as DX 1278D, could be used to determine the rate for ten-year Treasury notes at the relevant time. The website, http://www.treasurydirect.gov/RI/OFAuctions, could indeed be used for that purpose, and American Federal suggests that the court might take judicial notice of the data listed on the site because of the use at trial of other data

derived from the site. Pl.'s Computations at 4.

As the government points out, the court used the rate for a ten-year Treasury note issued in 1990 as the "safe rate" because that was the most reasonable such rate reflected in the evidence at trial, and it happened also to be the rate American Federal's expert, Mr. Jay, had used in connection with one of his models. *See* Def.'s Mot. and Resp. at 16 (citing *AmFed IV,* 72 Fed.Cl. at 617–18). The government asserts that there is no good cause for reopening the record to revisit this factual issue. *Id.* at 16–17.

The government has the better part of this argument by a considerable margin. The trial record is devoid of evidence respecting the yield of a ten-year Treasury note issued on or about March 1993. Moreover, judicial notice of that rate is not appropriate because the evidentiary question is not merely one of determining the rate for a ten-year Treasury note issued in or near March 1993. If that were all that was involved, the rate might well be a fact "not subject to reasonable dispute in that it is … (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). Instead, however, the benefit-rate issue also requires an assessment of the linkage of the rate to the tangible capital in the hands of the bank acquiring such capital. *See Home Savs. of Am. v. United States,* 399 F.3d 1341, 1354–55 (Fed.Cir.2005). That assessment could not be made without reopening the record.

More importantly, the trial of this case extended over a considerable period, namely 25 days, with nine days devoted to trial on liability and sixteen days taken up by trial on damages. In that context, the matter of a "safe rate" for the benefit American Federal derived from the tangible replacement capital after the second quarter of 1997 was resolved in a reasonable way, relying on the best available evidence adduced at trial. That the resulting rate, though reasonable,

might not reflect the best evidence that *could have been* adduced does not mean that the record should be reopened to admit new evidence. "Rule 59 is not a vehicle for … taking a 'second bite' at the apple." *Sequa Corp. v. GBJ Corp.,* 156 F.3d 136, 144 (2d Cir.1998); *see also Ajinomoto Co. v. Archer–Daniels–Midland Co.,* 228 F.3d 1338, 1350 (Fed.Cir.2000).[17] This is not a situation that involves newly discovered evidence, and reopening the record is not appropriate.

■ As its second proposed adjustment, American Federal seeks leave to withdraw part of its claim for breach of the contract it entered with the government to be able to count subordinated debt as regulatory capital. Pl.'s Computations at 8–10. The part that American Federal would withdraw relates to the Series B subordinated debentures. *Id.* at 8. The bank argues that by the time of its final mitigating step, the offering and exchange of common stock in March 1993, the Series B subordinated debentures had already been taken fully into American Federal's capital structure by an exchange of those debentures in 1990 for Series I preferred stock. *Id.* at 8–9; *AmFed IV,* 72 Fed.Cl. at 593. The exchange in 1990 was undertaken by the bank at the behest of federal regulators as a condition of the regulators' approval of American Federal's then-pending capital plan to mitigate the breach. *See AmFed IV,* 72 Fed.Cl. at 592–94, 598–99, 606. As American Federal would have it, the earlier mitigating step in 1990 meant that the successor security in 1993 underwent only a change in form and can be disregarded. American Federal would thus distinguish its claim for breach of the Series A subordinated debentures, which it would preserve, on the ground that the breach of contract respecting the Series A debentures was not mitigated until 1993 when those debentures were converted into common stock along with the concomitant exercise of the mandatory purchase contracts attached to the Series A

**17.** American Federal's proffered alternative rate, that yielded by medium-term Treasury securities held by CCB after its merger with American Federal in 1997, is inappropriate because it would be derived from events and circumstances remote to the breach. *See AmFed IV,* 72 Fed.Cl. at 603 (accepting the government's contention that the merger between CCB and American Federal and each of the subsequent mergers "were remote from the breach and therefore unrelated to American Federal's efforts to mitigate the effects of the breach").

subordinated debentures. *See* Pl.'s Computations at 8–9; *AmFed IV,* 72 Fed.Cl. at 605–07.

The government resists any such withdrawal, contending first that the contract to recognize subordinated debt as regulatory capital applied both to the Series A subordinated debt and to the Series B subordinated debt, Def.'s Mot. and Resp. at 18, and, second, that American Federal's belated request to withdraw part of the subordinated-debt claim was prompted by the fact that the calculations using the parameters specified by the court showed that American Federal derived a net benefit from the exchange of the Series B subordinated debt first into preferred stock in 1990 and then into common stock in 1993. *Id.* at 17. That net benefit amounted to $1,987,049 before being grossed up for taxes to $3,171,666. Pl.'s Computations Ex. A at 1. This benefit caused a reduction of the net damages due American Federal for the cost of replacing regulatory capital. *Id.*

American Federal's request is unavailing. Until now, the bank's claim for breach of the contract regarding subordinated debt related both to the Series A subordinated debentures and to the Series B subordinated debentures. *See, e.g., AmFed II,* 62 Fed.Cl. at 203–04 (liability decision). Indeed, the contract with the government to count subordinated debt as regulatory capital expressly referred to both series of the subordinated debentures, Series A and Series B, *see id.* at 204 (quoting the approval of the official authorized to bind the government, the Principal Supervisory Agent, Federal Home Loan Bank of Atlanta), as did the underlying application and staff recommendations. For American Federal to back away now just because the calculations for the Series B segment of the contract showed a net benefit rather than a net cost would disavow a key component of both the contract at issue and the progression of the case through trial.

As the Federal Circuit emphasized in *LaSalle Talman Bank, F.S.B. v. United States,* 317 F.3d 1363, 1372–73 (Fed.Cir.2003), where a non-breaching party mitigates a breach, both the costs incurred and the benefits achieved by that mitigation must be taken into account in assessing damages. American Federal cannot pick and choose which costs and benefits should be taken into account—it must accept the whole, as a whole. *See id.* at 1372 (quoting *Restatement (Second) of Contracts* § 347(c) cmt. e (1981)). In short, American Federal has presented no valid grounds for adjusting the calculation of damages or for reopening the record of trial.

### 3. *The government's requests for reconsideration.*

The government's requests for reconsideration are even more far-reaching than those of American Federal. Its requests shall be tested against the same interlocutory reconsideration standard as that employed respecting the bank's requests. *See supra,* at 213.

First, the government invokes RCFC 59 to make the overarching request "that the court reconsider its decision, reject plaintiff's computations, and enter judgment for defendant." Def.'s Mot. and Resp. at 1. The ground asserted for this broad request is that "plaintiff failed to carry its burden to prove that it suffered any damage as a result of the alleged breach." *Id.* Alternatively, the government asks the court to allow discovery on the parameters for calculating damages specified by the court and to reopen the record for receiving new evidence on damages. *Id.*

The leverage point the government identifies for this suggested Herculean move to cast aside the many days of trial is that the court failed to adopt any of the damage models proffered by American Federal's expert, Mr. Jay. Def.'s Mot. and Resp. at 3–7. In a sense, the government is correct about this starting point; the court concluded that none of Mr. Jay's models could be adopted *in toto.* However, the government overstates the consequences of this action by the court. Rejection by the court of part of Mr. Jay's models, adopting instead certain positions advanced by the government and experts testifying on behalf of the government, does not lead inexorably to a denial of any and all monetary damages. Rather, the court adopted parameters for calculating

damages that flowed specifically from the facts proven at trial, drawing some elements from American Federal's case and others from the government's case. Thus, the government's overarching contention has no merit whatsoever.

The Federal Circuit recently addressed a somewhat comparable situation in *Bluebonnet Savings Bank, F.S.B. v. United States,* 466 F.3d 1349 (Fed.Cir.2006). In that *Winstar*-related case, the government also criticized the trial court's adoption of criteria for a calculation of damages that reflected elements from the plaintiff's case and some aspects from the defendant's case. The court of appeals rejected that claim of error, observing that the trial court's "damages award was based on the court's analysis of the competing economic models." *Id.,* 466 F.3d at 1359–60. That is also what happened in this instance. *See also Hi–Shear Tech. Corp. v. United States,* 356 F.3d 1372, 1374 (Fed.Cir.2004) (approving a trial court's determination of a "reasonable method to calculate damages" where neither party had advanced computations that the court could accept in their entirety); *Tagatz v. Marquette University,* 861 F.2d 1040, 1045 (7th Cir.1988) (Posner, J.) (commenting that trial judges "are not wallflowers or potted plants" but instead are "to be commended rather than condemned" for undertaking their own computations based on the evidence); Tr. 3310:21 ("Th[e] court is not a potted plant."), 3317:2–25 (closing argument, July 28, 2006).

The contention put forward by the government that most strongly affected Mr. Jay's models was that American Federal's merger with CCB in August 1997 was remote from the breaches of American Federal's contracts that occurred late in 1989. American Federal and Mr. Jay took the position that the bank's merger with CCB was directly attributable to the breach. *AmFed IV,* 72 Fed.Cl. at 599. The court determined that the government's position was supported by the evidence and that American Federal's was not. *Id.* at 603 ("[T]he government contend[ed] that all of the events that occurred after August 1, 1997, beginning with the acquisition of American Federal by CCB and culminating with the merger of National Bank of

Commerce into SunTrust Bank in 2004, were remote from the breach and therefore unrelated to American Federal's efforts to mitigate the effects of the breach."). This determination meant that Mr. Jay's calculations of damages after the second quarter of 1997 had to be discarded, because those calculations reflected dividends paid by the merged entities to their shareholders (Mr. Jay's Model I) or to their holding companies (Mr. Jay's Revised Model I). Nonetheless, the tangible capital American Federal acquired continued to engender costs and benefits for damage purposes because the regulatory capital American Federal would have held in the non-breach, but-for world extended to 2011. *See id.* at 613–14. Steps 6 and 9 of the parameters specified by the court address this circumstance because they provide a means of quantifying the costs and benefits after the CCB merger, eliding the effect of that remote event. This approach fully implements fundamental principles of the mitigation doctrine as canvassed in *LaSalle Talman. See* 317 F.3d at 1373–75. On the one hand, "[t]he general rule is as articulated by Justice Holmes, that *unrelated events and remote consequences do not reduce the liability of the wrongdoer* for the losses caused by the wrong." *Id.* at 1373 (emphasis added) (citing *Southern Pac. Co. v. Darnell–Taenzer Lumber Co.,* 245 U.S. 531, 533–34, 38 S.Ct. 186, 62 L.Ed. 451 (1918)). Correlatively, the remote, unrelated events do not *increase* the wrongdoer's liability. *See LaSalle Talman,* 317 F.3d at 1373 (citing 1 *Dobbs Law of Remedies,* § 3.8(2) (2d ed.1993)).

■ That the court would endeavor to determine the costs and benefits of American Federal's mitigation by ignoring remote events such as the CCB merger thus followed directly from the court's findings of fact that accorded with the government's position on remoteness. Now, however, the government urges that the court reopen the record to redetermine the basis for computing the cost of replacement capital after the second quarter of 1997. *See* Def.'s Mot. and Resp. at 10. As noted, the parameters specified for those costs by the court were based on American Federal's actual average earnings per share over the first and second quarters of 1997 multiplied by a dividend

payout ratio of 34%. *See supra,* at 212 (step 6). This determination reflected the bank's actual earning experience up to the CCB merger, including its progressive increase of its dividend level to a "bank-like" ratio of 33–35% of earnings. *AmFed IV,* 72 Fed.Cl. at 616. That the resulting level of dividends essentially reflects an "allocation or apportionment of the actual dividends paid by the successor entities" is also a consequence of this determination. Def.'s Mot. and Resp., Declaration of Anjan Thakor (Oct. 16, 2006) ("Thakor Decl.") at 11–12. The earnings of the successor banks for periods succeeding the CCB merger obviously included earnings from the banking operations that had been in American Federal's hands. In all events, the government professes to have been "unaware that those earnings [*i.e.,* American Federal's earnings per share in 1997, prior to the merger with CCB] would be a basis for an award of damages in this case." *Id.* at 10. Such averred unawareness as an asserted ground for reopening the record is not credible, given the government's position on remoteness. Indeed, the government previously had shown its full cognizance of the circumstances by arguing, in contrast to its current position, "that it [would be] 'pure speculation' as to what dividend rate American Federal would have paid absent the CCB merger." *AmFed IV,* 72 Fed.Cl. at 616. Accordingly, to claim now that it has some evidence, not presented at trial, that American Federal's earnings in the second quarter of 1997 reflected a non-recurring gain, even if correct, does not constitute good cause for reopening the record.[18] The government's contention in this respect stands on precisely the same footing as American Federal's request to reopen the record to adduce different evidence on the benefit rate for tangible capital for the time following the CCB merger. Both have no merit.

A second ground for the government's motion for reconsideration similarly stems directly from another of its positions taken at trial that was accepted by the court. At trial, American Federal had claimed that the shares of common stock for which the Series B debentures were ultimately exchanged should be taken into account for damage purposes up to 2011, when American Federal's goodwill would be fully amortized. *AmFed IV,* 72 Fed.Cl. at 611.[19] American Federal thus would have put the common shares ultimately resulting from the Series B debentures on the same footing as the common shares newly sold in the 1993 offering. *See id.* (discussing Mr. Jay's Model I). One of the criticisms leveled at Mr. Jay's models by Dr. Thakor was that Mr. Jay had wrongly assumed that, absent the breach, all of the subordinated debt would have been recorded as regulatory capital throughout the term of the pertinent subordinated debenture. *See id.* at 613. Dr. Thakor also criticized keeping the common shares ultimately resulting from the exchange of the Series B subordinated debentures in the damage calculus past the term of the Series B debentures in the non-breach, but-for world. Tr. 2088:14 to 2089:7, 2098:12–25, 2099:13–15 ("Mr. Jay errs by computing series B [subordinated] debt costs after the series B debt would have matured."). Dr. Thakor pointed out that the contract entered in 1988 for recognition of subordinated debt as regulatory capital did not allow the full amount of the debt to be recognized as regulatory capital over the entire period of the debt instruments. Rather, "regulations of the Bank Board permitted American Federal initially to record all of the subordinated debt as regulatory capital, but thereafter a phase-out schedule applied and only a portion of the subordinated debt could be so recorded." *AmFed IV,* 72 Fed.Cl. at 613 (citing 12 C.F.R. § 561.13(c)(2) (1988)). The subordinated debt that could not be counted as regulatory capital would in effect constitute a "junk bond." *AmFed IV,* 72 Fed.Cl. at 619 (quoting testimony of Mr.

---

18. American Federal contends that the bank at that time also incurred offsetting non-recurring expenses related to the approaching merger. *See* Pl.'s Reply in Support of its Computation at 4–5.

19. This reference to the common shares "ultimately" exchanged for the Series B subordinated debentures takes account of the fact that the Series B subordinated debentures were first exchanged for shares of Series I preferred stock in 1990 and those preferred shares were exchanged for common stock in the 1993 offering and exchange.

Trimble, American Federal's Chief Financial Officer).

The court's adoption of Dr. Thakor's criticisms of Mr. Jay's approach to the capital resulting ultimately from the exchange of the Series B subordinated debt led to a set of modifications to Mr. Jay's models. First, the phase-out schedule set out in the Bank Board's regulations in effect at the time, 12 C.F.R. § 561.13(c)(2) (1988), was given effect. The capital elided by the breach was that which could be recorded under the phase-out schedule, and the avoided-cost benefit American Federal consequently realized compared to the non-breach, but-for world was similarly limited to the interest payable on the capital that could be counted under the phase-out schedule. *AmFed IV*, 72 Fed.Cl. at 613, 619–20. Second, because the Series B subordinated debt would have matured on January 15, 1999, both costs and benefits from the resulting common shares were cut off on the day prior to that date.[20] Consequently also, the cost of paying the principal amount of the Series B subordinated debt on January 15, 1999, was disregarded in the analysis of costs and benefits because the debt at and near the end of its term would have had no effect on the bank's regulatory capital in the non-breach, but-for world but rather would have been no different than junk-bond debt that had to be repaid on maturity.

The government contests these consequences without giving any recognition to the fact that they flow directly from the position it took at trial regarding phase-out of the regulatory capital that was recognized with the Series B subordinated debt. The limitations on the regulatory capital in the but-for world follow the phase-down schedule and had consequences for avoided interest and the tangible replacement capital in the real world, contrary to the protestations of the government's experts. *See* Def.'s Mot. and Resp. at Declaration of Dr. Christopher Barry ("Barry Decl.") at 8–9; Thakor Decl. at 3, 6, 12–13. Similarly, in the but-for world, the repayment of the principal amount of the

Series B subordinated debentures would have occurred no later than January 15, 1999, and would have been made without reference to any regulatory-capital item because the phase-down schedule would have run out prior to that date. Thus, the principal payment of that debt does not constitute an avoided cost of any regulatory-capital item, contrary to the government's experts. *See* Barry Decl. at 8–9; Thakor Decl. at 6, 12–13. These and other grounds asserted by the government for reconsideration of the costs and benefits associated with the replacement of the regulatory capital arising from the Series B subordinated debentures have no merit.

The government raises arguments of a somewhat different nature about the tangible capital generated through conversion of the Series A subordinated debt and the exercise of the MPCs tied to that debt. The government's first contention stems from the circumstance that Mr. Jay's first two models did not address the Series A subordinated debt and the MPCs. Def.'s Mot. and Resp. at 3–5. Most of American Federal's evidence regarding these subjects was presented on the first day of the damages trial by the bank's first factual witness, its Chief Financial Officer at the pertinent time, Michael Trimble. *See* Tr. 106:17 to 112:1, 194:14 to 198:2, 198:7 to 200:9, 240:8 to 244:9 (Test. of Trimble). Mr. Trimble's testimony at the damages phase of this case regarding the Series A subordinated debt and the attendant MPCs was not surprising. The Series A subordinated debt and MPCs had been explicitly briefed to the court and then addressed in *AmFed III* as part of the consideration of the parties' summary judgment motions on damages. *See* 68 Fed.Cl. at 356–57 & n. 12. Further, Mr. Trimble's testimony, taken with the documentary evidence admitted through his testimony, was sufficiently detailed to allow a calculation of the costs and benefits of replacing regulatory capital through the conversion of the Series A subordinated debentures and associated exercise of the MPCs. Indeed, Mr. Jay's belated Model II did not add anything of value to the

---

**20.** Actually, because the phase-out schedule recognized no capital contribution in the final year of an issue of subordinated debt, the effective

date of curtailment was the prior year's anniversary. *See AmFed IV*, 72 Fed.Cl. at 614 (Table I).

court in determining the parameters to be employed in calculating cost-of-replacement capital damages in this regard because his Model II suffered from several conceptual flaws. *See AmFed IV,* 72 Fed.Cl. at 611–12. In short, the government suffered no prejudice from Mr. Jay's failure to include calculations regarding the Series A subordinated debt and MPCs in his Model I and Revised Model I.

The government particularly seeks reconsideration of the court's finding that the Series A subordinated debentures would not have been converted to common stock until just before their maturity date, January 15, 2004. *See* Def.'s Mot. and Response at 11–12; Barry Decl. at 5–7. Factually, this contention is predicated upon the assumption that in the non-breach, but-for world American Federal would have paid dividends at the time and at the rate it did in the actual world. *See* Barry Decl. at 5. This assumption is wrong. Shortly before the breach, in January 1989, American Federal had completed a modified conversion that enhanced both its tangible and its regulatory capital, the latter through the contract with the government to count subordinated debentures as regulatory capital. At the time of the modified conversion, American Federal had advised prospective purchasers of its common stock that it "ha[d] no plans to pay dividends for the foreseeable future." *AmFed IV,* 72 Fed.Cl. at 600 (quoting PX 2333 (Letter from William L. Abercrombie, Jr., President and CEO, American Federal, to Mildred P. Lloyd, shareholder (June 21, 1991))). American Federal had adopted that posture because it wanted to expand its operations and

wanted to retain its earnings and build its capital position for that purpose. *AmFed IV,* 72 Fed.Cl. at 600. Consequently, American Federal would not have paid the dividends Dr. Barry assumes in the analysis he puts forward to support reconsideration. American Federal's expressed intent in January 1989 not to pay dividends for the foreseeable future was important to the analysis of the conversion of the Series A subordinated debentures in the non-breach, but-for world because paid dividends would have triggered a reduction in the conversion price of the debentures. *See id.* at 615.[21] The conversion price reduction was capped, and payment of dividends beyond the cap-level of reduction would have provided an incentive for the holders of Series A subordinated debentures to convert. Given the circumstances where dividends had not been planned prior to the breach, the court properly found that it was improbable that the cap would be reached before the maturity date of the debentures and thus that it was more likely than not that the Series A subordinated debentures would have been converted just before this maturity.[22] Accordingly, this further ground asserted by the government for reconsideration has no merit.

Finally, the government avers that the court should grant reconsideration because the cost-of-replacement capital parameters specified by the court do not "unambiguously define the 'but-for' world." Def.'s Mot. and Resp. at 11. This claim has no validity. As the preceding analyses show, the adjustments made by the court to American Federal's case for damages to account for certain criticisms made by the government's wit-

---

**21.** The court acknowledges an error in its opinion regarding the instrument to which the price reduction would have been applied. The court adverted to a reduction in the price per share of stock derived from the MPCs that had to be exercised at the time of conversion of the Series A subordinated debentures. *See AmFed IV,* 72 Fed.Cl. at 615. That was wrong. The reduction actually would have occurred in the conversion price of the Series A subordinated debentures themselves. *See* Def.'s Mot. and Resp. at 12 n. 5 (citing PX 2017 at 22–23, ¶ 6.5(c)). This error has no effect on the analysis.

**22.** The holders of the Series A subordinated debentures and MPCs in effect had purchased an option that would have value if American Feder-

al could increase the worth of its common stock over the holding period of the debentures. The option had many characteristics of a so-called "American option" to purchase stock at a "strike price." *See* Tr. 2158:16 to 2159:16 (Test. of Thakor). An "American call option," however, generally refers to call options on traded common stock, and the call options themselves are liquid in the sense that they are readily marketable. *See* Tr. 3041:1–15 (Test. of Thakor). By contrast, these options were not readily marketable because the Series A subordinated debentures were not publicly traded but rather were held by a few sophisticated institutional investors. *See AmFed IV,* 72 Fed.Cl. at 591 & n. 7.

nesses were expressly designed to reflect the differences between the actual world and the non-breach, but-for world.

In sum, the grounds put forward by the government for reconsideration are just as unavailing as the adjustments requested by American Federal.

## B. An Offsetting Award of Costs

In *AmFed IV,* the court awarded the government its reasonable expenses in preparing for and responding to the testimony given at the rebuttal phase of trial by American Federal's expert witness, Mr. Jay, on April 18, 2006. *AmFed IV,* 72 Fed.Cl. at 626–29. The court made the award on a conceptual basis, requesting that the government provide a more rigorous and exacting enumeration of these expenses than those it had offered with its motion for costs, separating the expenses incurred in addressing Mr. Jay's rebuttal testimony from a broader category of expenses that were not allowed. *Id.* at 629. The ensuing bill of costs submitted by the government totaled $148,149.40 and included claims for fees paid to Dr. Christopher Barry, the government's expert who testified on sur-rebuttal, for billings by Navigant Consulting, Inc. ("Navigant") a litigation consulting firm, and for payments to Alderson Reporting ("Alderson"), a reporter for a deposition. *See* Defendant's Bill of Costs ("Def.'s Costs") at 1. American Federal objects to the fees of Dr. Barry and Navigant on two key grounds—that those fees lack adequate documentation and that the government did not disaggregate the fees incurred solely in responding to Mr. Jay's rebuttal testimony from those incurred in preparation for the government's case-in-chief. Pl.'s Resp. to Def.'s Bill of Costs ("Pl.'s Resp.") at 2–6. As to the Alderson costs, American Federal asserts that the deposition of Mr. Jay on May 2, 2006, was unnecessary and that videotaping the deposition and ordering real-time transcription were unreasonable. Pl.'s Resp. at 7.

Precedents on the standards for awarding costs are largely focused on application of the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. *See Community Heating & Plumbing Co. v. Garrett,* 2 F.3d 1143 (Fed. Cir.1993); *Owen v. United States,* 861 F.2d 1273 (Fed.Cir.1988); *Naporano Iron & Metal Co. v. United States,* 825 F.2d 403 (Fed. Cir.1987); *see also* RCFC 54 Rules Committee Note (2002) ("the allowance of attorneys' fees and costs in this court is almost always determined under the provisions of 28 U.S.C. § 2412(a), (d) (the Equal Access to Justice Act)"). Although the EAJA is not directly applicable to this case because the costs are not being awarded to the "prevailing party" under that Act, 28 U.S.C. § 2412(d)(1)(A), but rather to a party awarded costs and expenses under RCFC 37(c) and this court's inherent authority, the general principles for awarding costs elucidated under the EAJA provide helpful guidelines.

■ Detailed billing records are an essential starting point for an award of costs and expenses. In addressing a recovery of attorneys' fees, the Supreme Court commented that "[t]he applicant should exercise 'billing judgment' with respect to hours worked ... and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In a similar vein, the Federal Circuit has stressed the need for contemporaneous, itemized billing records:

> The court needs contemporaneous records of exact time spent on the case, by whom, their status and usual billing rates, as well as a breakdown of expenses such as the amounts spent copying documents, telephone bills, mail costs and any other expenditures related to the case. In the absence of such an itemized statement, the court is unable to determine whether the hours, fees and expenses, are reasonable for any individual item.

*Naporano Iron,* 825 F.2d at 404; *see also Beta Sys., Inc. v. United States,* 866 F.2d 1404, 1406 (Fed.Cir.1989) (describing as sufficient documentation "typical billing records, showing time and charges, a description of the work done, and by whom"). These principles for awarding attorneys' fees are equally applicable to awards of costs for experts. *See Community Heating & Plumbing,* 2 F.3d at 1146 ("Due to the lack of reasonably specific documentation concerning the actual work done by the consultants ..., we deny

[plaintiff]'s request for recovery associated with those two experts."); *Baldi Bros. Constructors v. United States,* 52 Fed.Cl. 78, 85 (2002) ("As with attorneys' fees, expert fees and expenses must be both reasonable and adequately supported by documentation." (citing *Naporano Iron,* 825 F.2d at 404)).

▮▮ The burden is on the applicant to substantiate its bill of costs, *see Hensley v. Eckerhart,* 461 U.S. at 437, 103 S.Ct. 1933 ("[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."), and the court is not required to dissect the applicant's submissions to separate recoverable from non-recoverable costs. *Naporano Iron,* 825 F.2d at 405 ("We reject unequivocally any suggestion that the Claims Court had an obligation to reconstruct the bills for [the applicant]."); *Lion Raisins, Inc. v. United States,* 57 Fed. Cl. 505, 516 (2003) ("The court is not required to reconstruct plaintiff's attorneys' time records into recoverable versus non-recoverable groupings."). Nonetheless, the court may exercise a reasoned discretion in determining the particular amount of any award of costs. *See Hensley v. Eckerhart,* 461 U.S. at 437, 103 S.Ct. 1933 ("We reemphasize that the district court has discretion in determining the amount of a fee award. This is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.").

*1. Fees of Dr. Barry and his associates.*

▮ The government requests $84,554.45 to cover the fees of Dr. Barry, a professor of finance at Texas Christian University ("TCU"). Def.'s Costs at 2 & Ex. D. In support, the government submitted a sworn declaration by Dr. Barry and a consolidated invoice for the work performed by Dr. Barry and two of his colleagues at TCU, Professors Steven Mann and Mauricio Rodriguez.[23] Def.'s Costs Exs. D, E. Dr. Barry's declaration indicates that following the court's decision to allow Mr. Jay's rebuttal testimony, the government approved a budget of $89,600 for the work of Dr. Barry and his colleagues. Def.'s Costs Ex. D. The budget anticipated that Dr. Barry would perform 88 hours of work and that his two colleagues together would perform 92 hours of work. Def.'s Costs Ex. D.[24] At the conclusion of their work, $5,045.55 remained unspent from the allocated budget of $89,600. *Id.* Subtracting $5,045.55 from $89,600, Dr. Barry arrived at his "good faith estimate" of $84,554.45 for the work he and his colleagues performed in responding to Mr. Jay's rebuttal testimony. *Id.* Although Mr. Jay's rebuttal testimony on direct examination was given on April 18, 2006,[25] the submitted invoice covers all of the work Dr. Barry and his colleagues performed for this case from April 1, 2006 until May 31, 2006. Def.'s Costs Ex. E. Over that two-month period, Dr. Barry charged the government $151,298.53 as follows: $89,400 for Dr. Barry's 149 hours of work at $600 per hour, plus $5,098.53 for Dr. Barry's expenses, $28,700 for Professor Mann's 71.75 hours of work at $400 per hour, and $28,100 for Professor Rodriguez's 70.25 hours of work at $400 per hour. *Id.*[26]

In opposing an award of costs in accord with the government's request, American Federal avers that "no document—contemporaneous or *post hoc*" shows the number of hours Dr. Barry or his colleagues worked to respond to Mr. Jay's rebuttal testimony, in contrast to those hours spent in preparation

**23.** The government also submitted the individual invoices that Professors Mann and Rodriguez submitted to Dr. Barry. Def.'s Costs Ex. E.

**24.** The government presumably arrived at the $89,600 figure by multiplying each professor's hourly rate by the number of hours he was scheduled to work. Dr. Barry's hourly rate was $600, and that for each of his colleagues was $400. Thus, $(88 \times \$600) + (92 \times \$400) = \$89,600$. *See* Def.'s Costs Exs. D, E.

**25.** After a substantial hiatus, Mr. Jay was cross-examined on May 16, 2006. *See* Tr. 2842:7 to 2961:4 (Test. of Jay). Dr. Barry testified on sur-rebuttal on May 17, 2006. *See* Tr. 2974:11 to 3237:25.

**26.** The entry for Professor Rodriguez actually refers to "Real Educators, Inc.," Def.'s Costs Ex. E, but the government's bill of costs clarifies that Professor Rodriguez performed this work. Def.'s Costs at 2.

for the government's case-in-chief. Pl.'s Resp. at 2. Specifically, American Federal argues that because Dr. Barry was originally scheduled to testify in the government's case-in-chief—before the government knew that Mr. Jay would be testifying in the plaintiff's rebuttal case—much of Dr. Barry's work would have been performed even in the absence of Mr. Jay's rebuttal testimony. Pl.'s Resp. at 3–4. The inadequacy of the documentation, claims American Federal, also prevents the court from determining whether the fees claimed were reasonable. Pl.'s Resp. at 4.

The government has not provided the sort of contemporaneous, itemized billing records required for an award of costs. The government relies on its "budget" for Dr. Barry and his colleagues to prove that certain work they performed related to Mr. Jay's rebuttal testimony. Not only did the government not submit any documentation for such a budget, it provided no billing records specifically identifying work related to Mr. Jay's rebuttal testimony. Def.'s Costs at 2–3 & Ex. E. Moreover, the invoices the government did provide are inadequate on two grounds. First, the invoices are merely single sheets that state the total hours each of the three professors worked during the two-month period multiplied by their hourly rates, plus a few general descriptive phrases. Def.'s Costs Ex. E. Second, the invoices represent all of the work Dr. Barry and his colleagues performed on the case during the period and do not itemize which hours were spent responding to Mr. Jay's rebuttal testimony. *Id.* As Judge Allegra of this court has noted: "[W]hen [the Federal Circuit and the Court of Federal Claims] have rejected documentation for a fee, those courts have generally been faced with reconstructed or other forms of *post hoc* records, which, by their nature, include far less detail than . . . contemporaneous records.". *Applegate v. United States,* 52 Fed.Cl. 751, 769 (2002). Thus, the cryptic records the government has presented for the fees of Dr. Barry and his colleagues are inadequate. *See Naporano Iron,* 825 F.2d at 404. The question arises whether the court

should exercise its discretion to attempt to decipher from these bare records how much of the experts' time was spent preparing for Mr. Jay's rebuttal, even though the court is not required to undertake such an exercise. *See id.* at 405; *Lion Raisins,* 57 Fed.Cl. at 516.

Given that Dr. Barry and his colleagues charged the government $151,298.53 for their work during the two-month period, the government, by requesting $84,554.45 in costs, essentially is claiming that the TCU professors spent about 58% of their time responding to Mr. Jay's rebuttal testimony. Def.'s Costs Exs. D, E.[27] Nothing in the government's bill of costs, however, substantiates such an allocation. Dr. Barry was on the government's trial witness list, and the government indicated to American Federal only on April 15 or 16, 2006 that it had decided against calling Dr. Barry to testify in its case-in-chief. *See* Def.'s Trial Witness List at 2; Tr. 2581:1–6 (Apr. 17, 2006). A fair amount of Dr. Barry's work could have been accomplished before the court permitted Mr. Jay's rebuttal testimony on his revised damage calculations, but the government has provided only the most rudimentary means to identify that portion of Dr. Barry's work that pertained to Mr. Jay's rebuttal testimony. In that vein, many of Dr. Barry's sur-rebuttal demonstratives did not relate to the new damages calculation that Mr. Jay offered in his rebuttal testimony. *See* DX1867D–DX1881D. At trial, the government's counsel conceded that "some of [Dr. Barry's sur-rebuttal] demonstratives . . . are nearly identical to the ones we had previously planned to use." Tr. 3070:1–3 (May 17, 2006).

■ Notwithstanding the deficiencies in the government's documentation of its requested costs, the court has opted to review Dr. Barry's sur-rebuttal testimony and demonstrative exhibits to derive an estimate of the portion of that testimony that pertained to Mr. Jay's rebuttal evidence. Based upon that review, *see Hensley v. Eckerhart,* 461 U.S. at 436–37, 103 S.Ct. 1933, the court

---

27. Dr. Barry and his colleagues charged the government $151,298.53, $5,098.53 of which was attributable to Dr. Barry's expenses. Subtract-

ing these expenses leaves $146,200. $84,554.45 is approximately 58% of $146,200.

determines that the government should be awarded 30% of the amount sought for the work of Dr. Barry and his colleagues, or $25,366.34, plus expenses of $5,098.53, for a total of $30,464.87.

### 2. Fees of Navigant.

█ The government requests $62,060.25 for costs associated with Navigant's efforts to assist counsel for the government and Dr. Barry in responding to Mr. Jay's rebuttal testimony. A letter from Navigant dated September 7, 2006, forwarded to the government three summaries of its work, indicating that it had performed $62,060.25 worth of services "in connection with [the case] and associated with the plaintiff's rebuttal claim." Def.'s Costs Ex. C. The summary included the following charges: $27,466.25 for 75.25 hours of work by Rob Hutchins at $365 per hour, $18,832.50 for 77.50 hours of work by Alex Kuczkowski at $243 per hour, $13,230.00 for 94.50 hours of work by Pat McGee at $140 per hour, and $2,531.50 for 20.75 hours of work by Gregory Suellentrop at $122 per hour. Id. A summary listed the hours per day each of the four Navigant employees dedicated to the case between April 18, 2006 and May 17, 2006. Id. A separate one-page recitation set out brief descriptions of the particular tasks performed, the person who performed the tasks, and the number of hours spent per task. Id.

American Federal argues that Navigant's summary of the work it performed and the fees it charged are an inadequate substitute for the firms' actual billing records. Pl.'s Resp. at 4–5. American Federal also claims that particular charges, such as those associated with preparing Dr. Barry's demonstratives, should be excluded because they either might or might not have related to Mr. Jay's rebuttal testimony or because the summary contains insufficient detail to identify which tasks were related solely to Mr. Jay's rebuttal testimony. Pl.'s Resp. at 5–6.

The submissions for Navigant at least provide somewhat more detail than those supplied for Dr. Barry and his colleagues.

Nonetheless, Navigant's summaries suffer from two flaws also found in the submissions for Dr. Barry's costs—they are a *post hoc* accounting of Navigant's work rather than contemporaneous Navigant billing records, and they do not differentiate work preparing for Mr. Jay's rebuttal testimony from other work on the case. See Naporano Iron, 825 F.2d at 404; Beta Sys., 866 F.2d at 1406.

Because all of Navigant's work occurred after this court allowed American Federal to examine Mr. Jay as a rebuttal witness regarding his new damage calculations, one might infer that all of Navigant's work related solely to responding to Mr. Jay's rebuttal testimony. As American Federal notes, however, 67.65 hours, or one-fourth of Navigant's hours, are related to preparing Dr. Barry's demonstratives, many of which do not relate to Mr. Jay's rebuttal testimony. Def.'s Costs Ex. C; Pl.'s Resp. at 5. Other tasks, such as "preparation of Professor Barry's sur-rebuttal direct examination outline," raise similar questions. Def.'s Costs Ex. C. In short, Navigant's summaries provide this court with no method for separating Navigant's general work "in connection" with the case from work dedicated to responding to Mr. Jay's rebuttal testimony. See Naporano Iron, 825 F.2d at 404–05; Lion Raisins, 57 Fed.Cl. at 516; Applegate, 52 Fed.Cl. at 769.

█ Notwithstanding the lack of contemporaneous documentation and adequate specificity, the court has made a rough apportionment based on Dr. Barry's testimony and his demonstratives and has concluded that the government should be awarded 40% of the $62,060.25 sought for Navigant's work, or $24,824.10.[28]

### 3. Alderson Deposition Costs.

The government claims $1,534.70 for charges from Alderson Reporting Co. stemming from a deposition of Mr. Jay on May 6, 2006. Def.'s Costs at 1. An Alderson invoice includes the following charges: $791.35 for one-day delivery of the transcript, $0.35 for exhibit copies, $238 for a realtime transcript,

---

**28.** In contrast to the complete lack of detail provided respecting the work of Dr. Barry and his colleagues, Navigant's summaries, while not contemporaneous billing records, provide a more structured basis for allocation. *Compare* Def.'s Costs Ex. C, *with id.* at Ex. E.

$450 for videotaping, and $55 for processing and shipping. Def.'s Costs Ex. A. American Federal objects that the deposition was unnecessary because the government had already deposed Mr. Jay and asserts that the videotaping, real-time transcript, and overnight delivery were unreasonable. Pl.'s Resp. at 7.

American Federal's claim that the deposition was unnecessary is without merit. The possibility of deposing Mr. Jay before the beginning of his cross-examination on rebuttal was contemplated at the end of his direct testimony in rebuttal on April 18, 2006. *AmFed IV*, 72 Fed Cl. at 628; Tr. 2703:11–2705:17. In that regard, on April 18, 2006, American Federal's counsel stated that "if the court wishes that additional discovery take place before Mr. Jay's cross-examination[,] we don't object ... [and] if it's making Mr. Jay available for a short deposition, I think we would certainly accommodate that." Tr. 2704:9–11, 17–18.

 American Federal also objects to the government's use of one-day delivery service for the transcript of the deposition. Considering that the government had to prepare for cross-examination of Mr. Jay on May 16, 2006, one-day delivery is not unreasonable. Def.'s Costs Ex. A; Tr. 2841:1 to 2842:10; Pl.'s Resp. at 7. As for the real-time transcription, this service does appear to the court to be unreasonable. As American Federal points out, real-time transcription was unnecessary because the government had already heard Mr. Jay's rebuttal testimony on direct examination and could plan accordingly for his deposition. Tr. 2625:19 to 2703:10; Pl.'s Resp. at 7. Moreover, Alderson delivered a copy of the transcript to the government the day after the deposition. Similarly, videotaping the deposition seems unreasonable because Mr. Jay had already testified extensively at trial. Pl.'s Resp. at 7. In the absence of good reasons to employ real-time transcription or to videotape the deposition, these costs are unreasonable under the circumstances. *Naporano Iron,* 825 F.2d at 404. Subtracting the associated charges of $238 and $450 from $1,534.70, Alderson's total charges, yields an award to the government of $846.70 for deposition costs.

*4. Defendant's costs as a setoff to plaintiff's award.*

In sum, the government is entitled to $56,135.67 in costs associated with preparing for Mr. Jay's rebuttal testimony, based on $30,464.87 in fees and expenses for Dr. Barry and his associates, $24,824.10 for Navigant's fees, and $846.70 for Alderman's deposition costs. The resulting costs rounded to $56,136 will be set off against plaintiff's award of damages. *See* 10 Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Practice and Procedure,* § 2667 at 208–09 (3d ed. 1998) ("[T]he general rule is that a judgment for costs for one party may be set off against a judgment for another in the same action."); *see also Massachusetts Cas. Ins. Co. v. Forman,* 600 F.2d 481 (5th Cir.1979) ("Set off is ... the proper result under federal law.... '[A party] should not be permitted to collect a judgment in his favor leaving unpaid a judgment against him ... [i]n ordinary cases'; allowing an exception for 'an allowance for care and maintenance upon which the very life of the [party] depends.'") (quoting *Taylor v. Calmar S.S. Co.,* 35 F.Supp. 335 (E.D.Pa.1938) (other citations omitted)); *cf. Fietzer v. Ford Motor Co.,* 454 F.Supp. 966 (E.D.Wis. 1978) (addressing costs in connection with judgment).

### CONCLUSION

As explained, American Federal's damages for breach of contracts are $27,103,085 as the net cost of replacement capital, plus incidental losses of $3,610,081, *see AmFed IV,* 72 Fed.Cl. at 624, 629, offset by costs awarded to the government of $56,136. The Clerk shall enter judgment in favor of American Federal for the net amount, $30,657,030.

The motions for reconsideration are DENIED.

American Federal also is awarded its costs.

It is so ORDERED.

